(December 3, 1913.)

# WILLIAM H. BLACKMAN, Respondent, v. BEN Q. PETTENGILL, Receiver, Appellant.

[137 Pac. 182.]

STATE BANK—RECEIVER—FAILURE OF BANK—PAYMENT OF DIVIDENDS.

1.   Under sec. 3005, Rev. Codes, the entire procedure of the payment of dividends by the receiver of an insolvent bank is left to the order of the court, bound by the requirements of law as generally applied and administered in such cases.

2.   Sec. 5900, Rev. Codes, relating to proceedings in insolvency, should be read with the provisions of secs. 65 and 66 of the banking act of 1911 (Sess. Laws 1911, pp. 405, 406), in considering the *status* of a secured depositor of an insolvent bank, as compared with unsecured depositors.

3.   Under secs. 65 and 66 of the banking act of 1911 (Sess. Laws 1911, pp. 405, 406), a preference is given to depositors of an insolvent bank over all other creditors, and such depositors are to be classed on an equal footing. Under this statute distribution of assets to depositors must be made ratably, and no depositor can be given any advantage by reason of collateral or other security which he may hold from the bank for his deposit.

4.   *Held,* that the receiver of the Boise State Bank, Limited, an insolvent bank and trust company, has no authority to pay a dividend under an order declared by the district court upon a claim filed by B., a depositor holding real estate security valued at about $12,000, and B. cannot collect dividends on the full amount of his deposit, $14,144.14, and the receiver should treat said real estate as not embraced in the general assets; B. should not be allowed to enforce his claim against the other assets, irrespective of the value of the specific security, when it is shown that B. is prosecuting the foreclosure of a mortgage given him by the bank upon said real property to secure his deposit, and the receiver is contesting the validity of the mortgage, until that matter is determined; if the receiver is successful in that action, then B. should be entitled to receive the dividends that are paid to the other depositors; on the other hand, in case B. is successful in the foreclosure suit his claim should be held by the receiver without payment of dividends, and the net proceeds of such foreclosure proceedings should be applied on his claim against the bank. If there is a deficiency, B. should receive the same dividends on such deficiency that have been and will be paid to other depositors.

APPEAL from the District Court of the Third Judicial District for Ada County. Hon. Carl A. Davis, Judge.

An action to determine the authority of the trial court to make an order in the matter of the receivership of the Boise State Bank, Limited. Reversed.

Martin & Cameron, for Appellant.

The assets of an insolvent bank are distributed in the same order as assets of other insolvent estates, except such preferences as may be prescribed. (5 Cyc. 571.)

The laws of Idaho prefer depositors over all other creditors, but provide for no preference among depositors of insolvent banks. (Laws 1911, c. 124, secs. 65, 66; Rev. Codes, 2990; Laws 1905, p. 175, sec. 47.)

The doctrine contended for by respondent would tend to operate for inequality and discrimination between secured creditors, in favor of one holding collateral securities, not susceptible of prompt realization. (Dissenting opinion of Chief Justice White in *Merrill v. Jacksonville Nat. Bank,* 173 U. S. 131, 19 Sup. Ct. 360, 43 L. ed. 640.)

"The bankrupt law endeavors to enforce an equal distribution, whilst it respects the rights of those who have previously, by grant or otherwise, acquired some security or preferable right." (*Societe Generale de Paris v. Geen,* L. R. 8 App. Cas. 606, 620.)

That a secured depositor cannot be allowed to disregard the value of his security and prove for the whole debt, where the bankrupt statutes prohibit preferences and command a ratable distribution, has been the universal rule applied in bankruptcy in England and in this country from the beginning. (*Ex parte Smith,* 2 Rose Bankr. Rep. 63; *In re City Bank of New Orleans,* 3 How. (U. S.) 314.)

The decisions in the state courts are generally construing some local statutes, but those which hold, under their state laws as they stood at the time of the decision, for the rule that where a creditor holds collateral for his claim, he can sell his collateral or take into account its value and prove for

the residue are the following: *Wurtz v. Hart,* 13 Iowa, 515; *Security Investment Co. v. Richmond Nat. Bk.,* 58 Kan. 414, 49 Pac. 521; *American Nat. Bk. v. Branch,* 57 Kan. 27, 45 Pac. 88; *Burnham v. Citizens' Bk.,* 55 Kan. 545, 40 Pac. 912; *Citizens' Bk. v. State,* 8 Kan. App. 468, 54 Pac. 510; *Rogers v. Citizens' Nat. Bk.,* 93 Md. 613, 49 Atl. 843; *National Union Bk. v. National Mech. Bk.,* 80 Md. 371, 45 Am. St. 350, 30 Atl. 913, 27 L. R. A. 476; *Third Nat. Bk. v. Lanahan,* 66 Md. 461, 7 Atl. 615; *Merchants' Nat. Bk. v. Eastern R. Co.,* 124 Mass. 518; *Farnum v. Boutelle,* 13 Met. (Mass.) 159; *Armory v. Francis,* 16 Mass. 308; *Vandeveer v. Conover,* 16 N. J. L. 487; *Whittaker v. Amwell Nat. Bk.,* 52 N. J. Eq. 400, 29 Atl. 203; *Bell v. Fleming,* 12 N. J. Eq. 13; *Searle v. Brumback,* 2 Ohio Dec. (Reprint) 653; *Winton v. Eldridge,* 3 Head (Tenn.), 361; *Fields v. Wheatley,* 1 Sneed (Tenn.), 351; *First Nat. Bk. v. Williamson* (Tenn.), 35 S. W. 573; *In re Frasch,* 5 Wash. 344, 31 Pac. 755, 32 Pac. 771.

Wyman & Wyman, for Respondent.

The rule contended for by appellant never has been otherwise than a rule peculiar to bankruptcy and utterly rejected as being a part of the English common law. (*Kellock's Case,* L. R. Ch. App. 769.)

The bankruptcy rule was first announced in America in *Armory v. Francis,* 16 Mass. 308 (1820), but was promptly repudiated by Mr. Justice Woodbury (afterward of the supreme court of the United States) in delivering the opinion of the court in *Moses v. Ranlet,* 2 N. H. 488, who rejected the rule as being contrary both to reason and authority.

The chancery or equity rule was the common law, administered in the chancery courts of England since the time whereof the memory of man runneth not to the contrary. It found early support in the adjudicated cases in this country and is now supported by the great weight of authority. (*Moses v. Ranlet,* 2 N. H. 488; *People v. Remington,* 121 N. Y. 328, 24 N. E. 793, 8 L. R. A. 458; *Third Nat. Bank v. Haug,* 82 Mich. 607, 47 N. W. 33, 11 L. R. A. 327; *Harringan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909; *Corbett v.*

*Joannes,* 125 Wis. 370, 104 N. W. 69; *In re Burke,* 25 R. I. 302, 55 Atl. 825; *Kellogg v. Miller,* 22 Or. 406, 29 Am. St. 618, 30 Pac. 299; *Estate of Levin Bros.,* 139 Cal. 350, 63 Pac. 335, 73 Pac. 159; *Patten's Appeal,* 45 Pa. 151, 84 Am. Dec. 479; *Winston v. Biggs,* 117 N. C. 206, 23 S. E. 316; *Levy v. Chicago Nat. Bank,* 158 Ill. 88, 42 N. E. 129, 30 L. R. A. 380; *Findlay v. Hosmer,* 2 Conn. 350; *Walker v. Baxter,* 26 Vt. 710; *Hendrie v. Graham,* 14 Colo. App. 13, 59 Pac. 219; *Logan v. Anderson,* 18 B. Mon. (Ky.) 114; *Citizens' Bank v. Patterson,* 78 Ky. 291; *Van Winkle v. Blackford,* 54 W. Va. 621, 46 S. E. 589; *International Trust Co. v. Union Cattle Co.,* 3 Wyo. 803, 31 Pac. 408, 19 L. R. A. 640; *Merrill v. National Bank,* 173 U. S. 131, 19 Sup. Ct. 360, 43 L. ed. 640; *Sexton v. Dreyfus,* 219 U. S. 339, 31 Sup. Ct. 256, 55 L. ed. 244.)

So far as we know, no text-writer sustains any other doctrine than that for which we contend. (Jones, Collateral Securities, sec. 587; Zane, Banks and Banking, sec. 331; Tiffany, Banks and Banking, p. 420; Morse, Banks and Banking, sec. 629; Bishop, Insolvent Debtors, 3d ed., p. 503; *Allen v. Danielson,* 15 R. I. 480, 8 Atl. 705; *Chemical Nat. Bank v. Armstrong,* 59 Fed. 372, 86 C. C. A. 155, 28 L. R. A. 231, 65 Fed. 573, 13 C. C. A. 47, 28 L. R. A. 231.)

STEWART, J.—This is an appeal from an order made in the matter of the receivership of the Boise State Bank, Ltd., an insolvent bank and trust company. An affidavit was filed in the district court showing that the Boise State Bank was a banking corporation existing under the laws of the state, and at all times mentioned prior to December 19, 1911, was engaged in the banking business under the laws of the state; that on December 19, 1911, V. W. Platt was the duly appointed, qualified and acting bank commissioner of the state of Idaho, and at that time took charge of the affairs of the bank and its books and assets to wind up its business and to collect all debts due and claims owing to said bank, and that on the same day the district court made an order that the receiver take over into his possession the books, records and assets

of the bank and proceed to collect all debts, dues and claims and to wind up the affairs of the bank, and that said receiver duly qualified and performed his duty until discharged by the court February 7, 1913. On said date Ben Q. Pettengill was duly appointed special deputy state bank commissioner, with authority as receiver of the Boise State Bank for the purpose of winding up the affairs of the bank under the jurisdiction of the court; and on the same day V. W. Platt requested that he be discharged as liquidating officer and receiver of the bank, and upon the petition duly filed of A. E. Reed the duly appointed, qualified and acting state bank commissioner of the state, Platt's resignation as such officer was accepted February 10, 1913, and Ben Q. Pettengill was duly appointed special deputy state bank commissioner of Idaho, with authority as receiver of the said bank to take possession of the books, records and assets of the bank, and on the 8th day of February he qualified as such receiver. It is also shown that William H. Blackman, the petitioner, on November 10, 1910, deposited to his own account in the bank the sum of $13,483.60 and received a certificate of deposit for the same, and the bank promised and agreed to pay the said sum of money six months thereafter, with interest at four per cent per annum until paid; that on November 3, 1911, there was due thereon from said bank to the petitioner the sum of $14,144.14, and on that date the plaintiff agreed with the bank to extend the time of payment of said certificate for the period of four months, and the bank agreed to pay interest on said certificate and the money due thereon at the rate of eight per cent per annum; that on March 4, 1912, the petitioner presented his claim growing out of the matters aforesaid against the said bank to V. W. Platt as state bank commissioner and receiver, and that said claim was allowed and approved for the sum of $14,144.14, with interest from November 3, 1911, at eight per cent per annum, and that no part thereof has been paid; the petitioner alleges that a dividend of ten per cent upon all of the approved claims has been declared and ordered paid by the above-entitled court in the above-entitled matter, but that the receiver and special deputy

bank commissioner, Ben Q. Pettengill, declines and refuses and has not paid to the petitioner any sum whatever. The petitioner prays that the receiver be required to pay him the amount due him, to wit, ten per cent of said claim, and for such other relief as may be just.

Pettengill filed an answer, and in the answer denies the deposit stated in the petition as having been made on November 10, 1910, and that said bank promised and agreed to repay the petitioner the sum named six months thereafter with interest at four per cent per annum until paid, except as further alleged; and also denies that on November 3, 1911, or at any other time there was due upon the certificate of deposit the sum of $14,144.14, or that the petitioner agreed with bank to extend the time of payment four months; and denies that the bank agreed to pay petitioner interest on said certificate and the money due thereon at the rate of eight per cent, except as further alleged; and also denies that the claim was allowed and approved for the sum of $14,144.14, with interest from November, 3, 1911, at eight per cent, but alleges the fact to be concerning the presentation of said claim as set forth hereafter. It is then alleged that on February 16, 1909, Blackman, the petitioner, made a deposit in the bank in the sum of $12,440.43, payable to the order of himself as set forth in a certificate of deposit received by him on that date on return of said certificate properly indorsed six months after date, with interest at five per cent per annum, or, if paid before maturity, with interest at four per cent per annum, said sum to draw no interest after maturity, and said sum to be not subject to check; that on September 1, 1909, Blackman surrendered the certificate and received in its place and stead a certificate of deposit bearing date September 1, 1909, certifying that Blackman had deposited in the Boise State Bank, Ltd., $12,777.34, being the said original deposit of $12,440.43, with interest at five per cent per annum from February 16th to September 1st, 1909, or $336.91 added thereto, payable to the order of Blackman on return of certificate properly indorsed six months after date, with interest at five per cent per annum, or if paid

before maturity, with interest at four per cent per annum; that on May 10, 1910, Blackman surrendered said certificate and received in its place and stead the certificate of May 10, 1910, which certified that Blackman had deposited with the bank $13,219.22, being the original deposit of $12,440.43, with interest at five per cent per annum from February 16 to September 1, 1909, making $12,777.34, with interest at five per cent per annum from September 1, 1909 to May 10, 1910, or $441.88, payable to the order of Blackman on return of certificate properly indorsed six months after date; on December 10, 1910, petitioner surrendered certificate No. 1,200, and received in its place certificate of deposit No, 1,271, bearing date November 6, 1910, for the sum of $13,483.60, being the original deposit and the interest added for six months and fifteen days, making $12,777.34, with interest added for four months and twenty-four days, making $13,-483.60, payable to Blackman on return of certificate No. 1,271 properly indorsed, six months after date, with interest at five per cent per annum, or if paid before maturity, with interest at four per cent; and that on March 4, 1912, Blackman filed certificate of deposit No. 1,271 and presented his claim against the above-named bank and V. W. Platt, state bank commissioner as receiver thereof, upon said certificate of deposit No. 1,271, claiming $14,144.14, the same being $13,483.60, with interest of $660.54 to November 3, 1911, at five per cent per annum, and claiming interest at eight per cent per annum on said sum of $14,144.14 from November 3, 1911, and claiming that said sum was secured, but did not set forth the nature of said security; and alleges that the claim was filed, but that no further action was taken thereon by the receiver as to its being allowed or disallowed, or approved or disapproved; that said receiver has not paid dividends on any amount whatsoever upon any claim or claims except the original deposits, and only on the original deposits and not on the interest upon said principal sums. It is also alleged that Ben Q. Pettengill is informed and believes, and so alleges, that Blackman claims to hold security for the payment of the sum above set forth in the form of a note

and mortgage on real property of the bank, as follows: Lots 1, 2, 3, 4 and 5, block 13, Riverside Addition to Boise City, Ada county, as the same appears on the official plat, together with the tenements, hereditaments, etc.; that said property is of the value approximately of $18,000, and is free and clear of all liens and encumbrances except the taxes, not to exceed $400, and except lien, if any lien is valid, for this same debt owing to Blackman. Then follows the prayer that Blackman be ordered to produce and set forth the nature of his claimed security and claimed lien, before Pettengill is required to pay any sum or amount on the claim, and that in the event that Blackman is adjudged to have a valid and subsisting lien or mortgage upon any of the assets of said bank, that Blackman be compelled first to exhaust his security; or, second, that he be only admitted as a creditor for the balance of the debt, after deducting the value of said mortgaged property, said value to be ascertained in such manner as the court may direct, and that, in any event, the amount of the claim of Blackman be considered as $12,440.43, without interest, as all other claims have been considered by the receiver, and in the event that said claim of Blackman is duly adjudicated to be an unsecured claim, that the receiver be only ordered to pay upon the sum of $12,440.43; and that it be ordered that unless Blackman set forth his claim for security before any dividend is ordered paid, or before he accepts any dividend payment, that he be forever debarred from realizing upon or claiming any security whatever in or to the assets of said bank.

Upon this record the trial court issued an order: "That the said Ben Q. Pettengill, as special deputy bank commissioner of the state of Idaho, and as receiver in the matter of winding up the affairs of the Boise State Bank, Limited, an insolvent bank and trust company, do pay to the said William H. Blackman the dividend of ten per cent heretofore declared by this court upon the claim filed by the said Blackman." This is the order from which this appeal has been taken.

The question presented by this record, and which has been presented to this court in the brief of counsel and in their oral argument, is this, Does the law and the facts presented warrant the petitioner, a depositor holding security valued at about $12,000, in collecting dividends on the full amount of his deposit, $14,144.14; or should the receiver treat the twelve thousand dollars' worth of real estate as not embraced in the general assets, and this creditor be allowed to enforce his whole claim against the other assets irrespective of the value of the specific security acquired by his lien?

On March 6, 1905, the legislature of the state enacted House Bill No. 167 (Sess. Laws 1905, p. 175). In that act provision was made for the appointement of a state bank commissioner, and sec. 39 relates to the involutary liquidation of bankrupt banks, and that the bank commissioner "shall proceed to administer the assets of the bank in accordance with law." The entire procedure of payment of dividends is left to the order of the court bound by the requirements of law as generally applied and administered in such cases. There was no provision in the statute of any limitations of the procedure and there was no statutory direction or limitation whatever.

Sec. 47 of that act provides: "That in the event of insolvency or bankruptcy of any person, firm, copartnership or corporation maintaining, operating or conducting a bank or a banking department or doing business within the meaning of this act, depositors of such bank or banking department shall have a first and prior lien on all the assets of such bank or banking department, and in the distribution of such assets or the proceeds thereof, the same shall first be applied to satisfy the amount due such depositors." This section also makes provision that "the depositors of any such bank or subordinate bank or banking department shall have a *first and prior lien upon all the assets of such bank, or banking department where such deposit was made or credit extended, and in the distribution of such assets or the proceeds thereof, the same shall first be applied to satisfy the amount due such depositors.*" Sec. 47 of the act of 1905 was

incorporated in the Rev. Codes as sec. 2990, as a part of the article relating to "Transaction of Banking Business." While sec. 39, which provides in effect that the assets shall be distributed according to law, is incorporated in the code as sec. 3005, as a part of the article of the banking law entitled, "Supervision of Banks by the Commission."

When the banking law of March 1, 1911 (Sess. Laws 1911, p. 386), was enacted, sec. 66 was placed in the act, which provides: "No creditor or creditors of any individual banker or of individual members of any copartnership doing a banking business in this state shall be permitted to attach or seize under writ of attachment or execution or to hold liable for such individual indebtedness any of the assets of the bank until all the depositors and creditors of such bank have been fully paid."

Under this provision counsel for respondent contend that the law of 1905 directs that the assets be administered in accordance with the law, and that the legislature has not changed that law up to the time covering the failure of the Boise State Bank, and that the bank's certificates of deposits were surrendered from time to time as they fell due, and new ones issued, the last bearing date November 6, 1911, and that the certificates issued to Blackman continued in full force and effect as the original unsecured debt, and that the renewals of certificates of deposit and the giving of a mortgage to secure the indebtedness of the bank on the bank's real property did not change and remove the effect of the first certificate. This court does not feel inclined to follow this rule, and during this opinion we will further discuss this question.

Referring now to secs, 65 and 66, chap. 124, Laws of 1911, pp. 405 and 406, sec. 65 provides:

"In the event of insolvency or bankruptcy of any person, firm, copartnership or corporation maintaining, operating or conducting a bank or trust company doing a banking business, or doing business within the meaning of this act, depositors of such bank or trust company shall have the first and prior lien on all assets of such bank or trust company,

and in the distribution of such assets or the proceeds thereof, the same shall first be applied to satisfy the amount due such depositors.''

Sec. 66 provides: "No creditor or creditors of any individual banker or of individual members of any copartnership doing a banking business in this state shall be permitted to attach or seize under writ of attachment or execution or to hold liable for such individual indebtedness any of the assets of the bank until all the depositors and creditors of such bank have been fully paid.''

By these two provisions above referred to, we have no doubt but that the legislature intended to give depositors a preference over all creditors and to place the depositors on an equal footing. The provisions are silent as to preferences among depositors, but class all depositors together; preferences or unequal advantages among depositors are not sanctioned, and the only conclusion is, and we think this court is fully justified in holding, that the statute places all depositors in a class, and that distribution of assets under the statute to depositors is to be made ratably, and that it was not intended by the legislature that one depositor should be given any advantage or benefit by reason of a security he may hold for a deposit, and thereby withdraw from the general assets a dividend on his accumulated claim the same as depositors who have no security, because the result would be an advantage over the general depositors, and he would receive more than his ratable share of the assets. (5 Cyc. 570.)

Blackman filed certificate of deposit No. 1271 and presented his claim against the above-named bank and Platt, state bank commissioner as receiver, upon said certificate of deposit No. 1271, claiming $14,144.14, the same being $13,483.60, with interest of $660.50 to November 3, 1911, at five per cent per annum, and claiming interest at eight per cent per annum on said sum of $14,144.14 from November 3, 1911, and claiming that said sum was secured. The trial court entered an order directing Pettengill, as deputy bank commissioner and receiver, to pay to the said Blackman the

dividend of ten per cent heretofore declared by the court upon the claim filed by Blackman.

It will thus be seen that the trial court classed Blackman as a depositor of the bank without any security, and thereby allowed him to remove and set aside $12,000 worth of property from the general assets, and allowed him to set up that same $12,000 as a part of his claim of $14,144.14 against the remaining assets of the bank, and Blackman was allowed to enforce his whole claim against the other assets, irrespective of the value of the special security acquired by the lien. This decree of the trial court is clearly erroneous and in violation of the provisions of chap. 124, secs. 65 and 66, Laws of 1911. These provisions above quoted state the same rule that the courts have universally followed, where there were no statutes governing, in determining that dividends should be declared out of the general assets after the secured creditors have withdrawn the amount of their security.

Chief Justice White, in his dissenting opinion in *Merrill v. National Bank of Jacksonville,* 173 U. S. 150, 19 Sup. Ct. 368, 43 L. ed. 647, in dealing with this question says:

"Thus a secured creditor who takes collaterals maturing on the same day with the debt owing to himself, which collaterals consist of negotiable notes, the makers of which and indorsers upon which are pecuniarily responsible, finds the collaterals promptly paid when deposited for collection, and if his debtor should become insolvent the day after payment, the creditor could only claim for the residue of the debt still unpaid. On the other hand, a creditor of the same debtor, the debt to whom matures at the same time as that owing the other creditor, and is secured by collaterals also due contemporaneously, has the collaterals protested for nonpayment, and when the debtor fails the collaterals have not been realized. While the first debtor who had received first-class collateral can collect dividends against the estate of his insolvent debtor only for the unpaid portion of the claim, losing a part of such residue by the inability of the estate to pay in full, the debtor who received poor collateral collects dividends out of the general assets on his whole

claim, and, if he eventually realizes on his securities, may come out of the transaction without the loss of one cent. These illustrations, to my mind, adequately portray the inequality and injustice which must arise from the application of the rules of distribution now sanctioned by the court."

This opinion of Justice White was concurred in by Justice Harlan and Justice McKenna. Judge Gray, a member of the court, also dissented, and says:

"I cannot avoid the conclusion that, under every act of Congress directing the ratable distribution among all creditors of the estate of an insolvent person or corporation, and making no special provision as to secured creditors, an individual creditor holding collateral security from the debtor on part of the estate in course of administration is not entitled to a dividend upon the whole of his debt without releasing the security or deducting its value; and that therefore the judgment of the circuit court of appeals should be reversed."

This rule announced by Justice Gray, which is the correct rule where the conditions are such as he relates in his conclusion, is applicable to the facts in the present case, as Blackman is attempting to collect his entire full claim, and the security he has is withdrawn from the general assets of the bank, and Blackman is claiming a dividend on his entire claim, without reference to the security he holds, and he has made no effort to enforce the security he holds, which is a mortgage and could be foreclosed and the property sold and the amount that would be secured from the sale, less the expenses and costs, that Blackman would receive, could have been credited upon his entire claim, and thereby the general creditors would have been benefited to the extent of the credit of Blackman.

This same rule is also considered by the house of lords in the case of *Societe Generale de Paris v. Geen*, L. R. 8 App. Cas., p. 606: "Under ordinary circumstances each creditor is at liberty to pursue at his discretion the remedies which the law gives him; but when insolvency intervenes, and the debtor is unable to pay his debts, the position of all parties

is altered—the fund has become inadequate, and the policy of the law is to lead to equality. In pursuing that policy the bankrupt law endeavors to enforce an equal distribution, whilst it respects the rights of those who have previously, by grant or otherwise, acquired some security or some preferable right.''

Justice Story, in 1845, in *Re City Bank of New Orleans,* 3 How. (U. S.) 292, 11 L. ed. 603, in discussing the same question involved in this case, on p. 315 of 3 How. says: ''If they have a pledge or mortgage therefor, they may apply to the court to have the same sold, and the proceeds thereof applied toward the payment of their debts *pro tanto* and to prove for the residue.''

In the case of *Merrill v. Nat. Bank, supra,* Justice White calls attention to the change that has taken place in Great Britain with reference to the distribution of the assets of an insolvent estate: '' 'The same rule shall prevail and be observed as to the respective rights of secured and unsecured creditors, and as to debts and liabilities provable . . . . as may be in force for the time being under the laws of bankruptcy with respect to the estates of persons adjudged bankrupt.' So that now, in Great Britain, in all proceedings involving the distribution of an insolvent fund, a secured creditor can only prove for the balance which may remain after deduction of the proceeds or value of collateral security.''

Several of the courts, in considering the method of distribution where the creditor holds collateral for his claim, hold that he can sell his collateral or take into account its value and prove for the residue. (5 Cyc., p. 571; *Wurtz v. Hart,* 13 Iowa, 515; *Security Invest. Co. v. Richmond Nat. Bank,* 58 Kan. 414, 49 Pac. 521; *Rogers v. Citizens' Nat. Bank,* 93 Md. 613, 49 Atl. 843; *Merchants' Nat. Bank v. Eastern R. R. Co.,* 124 Mass. 518; *Vanderveer v. Conover,* 16 N. J. L. 487; *Searle v. Brumback,* 2 Ohio Dec. 653; *Winton v. Eldridge,* 3 Head (Tenn.), 361; *In re Frasch,* 5 Wash. 344, 31 Pac. 755, 32 Pac. 771.)

There are a large number of cases in each of the states, from which we have cited a single case, that support the rule stated in this opinion, and it would require a good deal of space to cite all the cases supporting the rule.

In connection with the rule announced by the authorities cited above, and secs. 65 and 66 of chap. 124, Laws of 1911, sec. 5900, Rev. Codes, which is a part of Title 12 of Proceedings in Insolvency, provides as follows:

"When a creditor has a mortgage or pledge of real or personal property of the debtor, or a lien thereon, for securing the payment of a debt owing to him from the debtor, he must be admitted as a creditor only for the balance of the debt, after deducting the value of such property, to be ascertained by agreement between him and the assignee, or by a sale thereof, to be made in such manner as the court or judge may direct; or the creditor may release or convey his claim to the assignee, upon such property, and be admitted to prove his whole debt. If the value of the property exceeds the sum for which it is so held as security, the assignee may release to the creditor the debtor's right of redemption thereon on receiving such excess; or he may sell the property subject to the claim of the creditor thereon, and in either case the assignee and creditor respectively must execute all deeds and writings necessary or proper to consummate the transaction. If the property is not sold or released, and delivered up, the creditor must not be allowed to prove any part of his debt."

Under this latter section when read with the subsequent act, chap. 124, Laws of 1911, we think there can be no question whatever but that the plaintiff in this case was not permitted to receive the dividend ordered to be paid by the district court.

Counsel for respondent has cited a number of cases to the effect that the rule never has been otherwise than a rule peculiar to bankruptcy and utterly rejected as being a part of the English common law. Those cases perhaps state the correct rule governing the facts under the common law and in equity, but the legislature of this state has refused to

adopt that rule, and has by proper legislation provided for the distribution of the assets of an insolvent bank, and this rule results in a requirement compelling the ratable distribution of insolvent assets by the banking law enacted, and considered in the opinions, which law prefers depositors and places them in the same class in a ratable distribution, and should apply in distributing the assets to the depositors, whether the depositors are secured or unsecured, and as to debts and liabilities provable as may be in force at the time under the bankruptcy statute, with respect to the assets of persons adjudged bankrupt; and in all proceedings involving the distribution of an insolvent fund a secured creditor can only prove for the balance which may remain after deduction of the proceeds or value of collateral security; and where a creditor holds collateral for his claim, he can sell his collateral or take into account its value and prove for the residue.

It follows from this opinion that the trial court erred in allowing Blackman's claim against other assets and not against security; the mortgage was in Blackman's possession and still is held by Blackman, as against an asset of the bank, and his claim is against the general assets, and he had not taken steps to foreclose the same at the time the bank closed, or thereafter, or before he filed the claim. There was not a ratable distribution of the assets of the bank. He was not entitled to a dividend of ten per cent the same as other depositors who held no security.

The record in this case shows that a dividend of ten per cent upon all of the approved claims has been declared and ordered paid by the court in the above-entitled matter, but that the receiver and special deputy commissioner, Ben. Q. Pettengill, declines and refuses to pay and has not paid to the petitioner any sum whatever, and this action was brought for the purpose of securing a judgment requiring the commissioner to pay said dividend. Blackman should be required to proceed and foreclose his mortgage and have the mortgaged property sold as provided by law, and apply the net proceeds of such sale, after paying the court costs of

foreclosure, etc., upon his claim against the insolvent bank, and if there is any deficiency remaining, the deputy bank commissioner should pay him the same dividends on said deficiency as are paid to all other depositors, and this applies to the claim involved in this case. It was stated on oral argument that an action to foreclose has already been begun, but that the deputy bank commissioner was contesting the validity of said mortgage, and if the commissioner is successful in that matter, then of course Blackman should be entitled to receive the dividends that are paid to other depositors. Blackman's full claim should remain filed with the commissioner, and in case he is successful in his foreclosure suit, the net proceeds of such foreclosure proceedings should be applied on his claim against the bank, as above stated. If there is a deficiency, he should receive the same dividends on such deficiency that have been and will be paid to other depositors.

The judgment is reversed, and the trial court is directed to enter judgment in accordance with this opinion. Costs awarded to appellant.

Sullivan, J., concurs.

Ailshie, C. J., sat at the hearing but did not participate in the consideration or decision of the case.