First American Bank & Trust Company, a Banking Corporation of Florida, as Receiver of the Farmers Bank & Trust Co., a Banking Corporation of Florida, and Ernest Amos, Comptroller of the State of Florida, *Appellants*, v. Town of Palm Beach, Florida, a Municipal Corporation Organized and Existing Under and by Virtue of the Laws of the State of Florida, *Appellee*;

And

First American Bank & Trust Company, a Banking Corporation of Florida, as Receiver of Farmers Bank & Trust Company, a Banking Corporation of Florida, et als., *Appellants*, v. Board of Commissioners of Lake Worth Inlet District, a Corporation Under the Laws of the State of Florida, *Appellee*.

Division B.

Opinion filed July 17, 1928.

Petition for rehearing denied October 9, 1928.

*Wideman & Wideman,* Attorneys for Appellants;

*E. Harris Drew, Richard P. Robbins* and *Chillingworth & Simon,* Attorneys for Appellees.

BUFORD, J.—Two cases have been consolidated. Farmers Bank and Trust Company was a State Banking Corporation doing business in West Palm Beach, Florida. It had financial reverses and was compelled to close its doors under the state banking laws. At the time the bank closed its doors the Town of Palm Beach had on deposit therein approximately $1,162,755.54. The Board of Commissioners of Lake Worth Inlet District had on deposit in the

bank at that time approximately $1,593,522.92. Each of the depositors had demanded and received certain collateral in the form of securities and surety bonds. After the bank was closed the depositors sold the collateral security and collected the amounts pledged in the security bonds. The Town of Palm Beach realizing therefrom approximately $289,658.01 and the Board of Commissioners of Lake Worth Inlet District realized approximately $730,-605.33. These depositors each then sought to have their respective claims allowed in full by the receiver without surrendering to the receiver the process obtained from the sale and settlement of the collateral and or without deducting from the full amount of the said claims respectively the amounts realized respectively from the collateral. The receiver refused to allow the claims in full and demanded of each of the depositors that the net amount received from the collateral held by each respectively should be deducted from its claim and thereupon that the claim should be filed for the balance or that each of the such depositors respectively surrender to the receiver the amount realized from its collateral and then file a claim for the full amount of its deposits on the date of closing. Each of the depositors then filed suit to require the receiver to allow proof of the full amount of their respective claims reperesented by the amount of their deposit at the time the bank closed its doors. Demurrer was filed in each case and overruled. From the order overruling the demurrer in each case appeal was taken. On reaching this court the issues in both cases being identical and the appellant in both cases being identical, the cases were consolidated. The questions here presented are, first, whether or not a state banking institution may pledge collateral securities to guarantee a depositor against loss of such deposit; second, if such collateral security may be pledged;

then, in the event of the bank becoming insolvent, will a depositor holding collateral securities be allowed to prove only the balance of the claim after deducting the value of such securities, or will such depositor be allowed to prove its claim in full without regard to the existence of any collateral?

The authority of a State banking institution to guarantee deposits by pledging collateral security is controlled in many states by statute. In others it is controlled by court decisions based upon what the courts conceive to be a proper public policy. In others, as in this State, the question of such authority may be said to be controlled by a legislatively established public policy.

Sec. 143 and 148, Rev. Gen. Stats. of Florida, established the policy of requiring certain State officials to deposit the moneys of the State in such banks in the State as will offer the best inducement as to interest and security and these statutes must be construed to be a recognition by the legislature of the State of Florida of the authority of State banks, all of which are organized under legislative authority, to pledge collateral security to protect deposits of public money and thereby establishes a public policy which should be given weight by the courts of this State when dealing with that question.

Aside from the legislatively established public policy which must be deemed to apply to deposits of public funds (and it is not necessary for us to now determine whether this policy applies to deposits of private funds), we view with approval the law as enunciated in the case of United State Fidelity & Guaranty Co. v. the Village of Bassfield, a very recent case decided by the Supreme Court of Mississippi and reported in 114 So. R, page 26, which is "A bank may receive special, specific and general deposits and give security for them." Citing More on Banks and Banking, Vol 1, Sec. 63, page 122. This authority is supported

by Wylie v. Bank, 63 S. C. 406; 41. So. E. R. 504; Cameron v. Christy, 286 Pa. 405, 133 Atl. R. 551; Ward v. Johnson 95 Ill. 215; McFerson, National Bank Commissioner, v. National Security Co., 72 Colo. 482, 212 Pac. R. 489; Richards v. Osceola Bank, 79 Iowa 707, 45 N. W. R. 294; and Wethington v. Jones, 41 Texas Civil Appeals, 463, 91 So. W. R. 818; Ahl v. Rhoads, 84 Pa. 319; Williams v. Ahl (Arizona), 249 Pac. R. 755.

In Cameron v. Christy, 286 Pa. State Reports 406, which was cited with approval by the Supreme Court of Mississippi in the case of United States Fidelity Co. v. Village of Bassfield, *supra,* the court says:

"The right of a bank to pledge property to secure loans or deposits was sustained in Ahl v. Rhoads, 84 Pa. 319, and has also been upheld in other jurisdictions; Richards v. Osceola Bank, 79 Ia. 707; McFerson v. National Surety Co., 72 Colo. 482; Ward v. Johnson, 95 Ill. 215; Morse on Banks and Banking, Sec. 63. In McFerson v. National Surety Co., *supra,* the court said (page 483):

" 'There is no question that a bank, in order to secure deposits may give security for them. The giving of the indemnifying bonds was within the authority of the banks, and was a matter of ordinary business. The banks owned the securities pledged to the surety company and had full right so to pledge them. It is further undoubted that when collateral has been pledged as security the pledger has no right to such collateral until the purpose of the pledge has been fulfilled. It is unnecessary to cite authorities on these points.'

"There is authority to the contrary, holding that a bank is not authorized to pledge its assets as col-

lateral security for funds deposited with it by certain of its customers, the theory being that to permit such act would be to confer power on officers of the bank to give a preference to favored customers (Commercial Bank & Trust Co. v. Citizens Trust & Guaranty Co., 153 Ky. 566). This decision was based mainly on the construction of the banking laws of that state, it being held that since no express power to pledge assets was given in the provisions of the act relating to deposits, no such power would be implied. The court in this last named case also recognized an exception where the law required security before a deposit could be made, as in the case of public funds, in which case it would necessarily have the right to furnish the required security."

We disposed of the first question presented by holding that State banks in the State of Florida may lawfully pledge securities to protect deposits of public funds. Both the secured deposits involved in the case here under consideration constituted public funds, therefore, it is not necessary for us to at this time attempt to determine and to say whether or not deposits of private funds may be likewise protected by the pledging of securities to the depositor.

It has been contended that to hold that the pledging of securities to protect deposits in State banks would be unfair to other depositors who are unsecured because the financial reports of banks show as a part of the assets securities which are pledged to protect deposits without indication that such securities are so pledged. If this contention is true, it may be easily obviated by the State Comptroller requiring financial statements and reports of State banks to show what amount of the assets of the bank is pledged as security for deposits.

We now pass to the second question presented. i. e., If

collateral security shall have been lawfully pledged to protect a depositor and thereafter the bank shall have become insolvent, will a depositor holding collateral securities be allowed to prove only the balance of the claim after deducting the value of securities, or will such depositor be allowed to prove its claim in full with regard to the existence of any collateral?

As to the rule which is to be applied in such cases, there is much conflict of opinion as expressed by the courts of last resort in this country. The rule that a depositor holding collateral securities shall be allowed to prove only the balance of the claim after deducting the value of such securities is commonly known as the bankruptcy rule, while the rule that such a depositor will be allowed to prove its claim in full without regard to the existence of any collateral is known as the English Chancery Rule.

It appears that the Supreme Court of the United States in such cases would only apply the English Chancery Rule, but we are not at all sure that had the case of first impression in the Supreme Court of the United States presented a state of facts such as those presented here that the English Chancery Rule would have been adopted by that Court. The leading case in the U. S. Supreme Court Reports is that of Merrill v. National Bank of Jacksonville, 173 U. S. 131, 43 Law. Ed. 640, in which the English Chancery Rule was adopted, but in that case, and in the others involving this question which have come to our attention as being decided by the Federal Courts, the parties whose rights were being tested were those who having made loans to the bank held security for their loans, while in this case the parties whose rights are being tested are depositors who received collateral securities to protect deposits and who, after the bank had become insolvent, converted the collateral so held into cash and held the same before attempting to

make proof of claim. It appears to us, that when the depositor had converted his collateral securities into cash it became and was his duty to give the bank account credit for that cash, and that when the depositor in this position sought and attempted to make proof covering the entire amount of his deposit at the time the bank closed such deamount far in excess of the sum due from the bank to the depositor, such total sum having been decreased by the amount already obtained in cash from the conversion of the securities.

We feel that we may logically distinguish a difference between a deposit and a loan. The Supreme Court of South Dakota in the case of Allibone v. Ames, reported in 68 N. W. R. 165, distinguishing the difference between a deposit and a loan, say:

"When the personal property involved is money, it may be difficult, under some circumstances, to determine whether the transaction should be called a deposit or a loan; but the two are not the same, and are never so regarded by any one in business, or the ordinary affairs of life. Certainly the thousands who daily deliver money to banks for safe-keeping and return in corresponding currency, do not regard the transaction as a loan, nor do they speak of it. A careful examination of the definitions given in the Civil Code will show the distinction between these terms. A deposit is for the benefit of a depositor; a loan for the benefit of the borrower. It is true, a deposit may also benefit the depositary, but such is not the primary object of the transaction. When the deposit is made for a fixed period during which the depositor has no right to demand a return of the money, the transaction may be regarded as in all substantial respects a loan, but herein lies an essential distinction between a loan and a general de-

posit. In the former the person receiving the money agrees to return it at a future time; in the latter at any time it is demanded. If it is agreed that the money shall remain for a fixed period, there is a loan, and not a deposit.''

And in support of this enunciation that Court cites Law's Estate, 144 Pa. St. 499; 22 Atl. R. 831 and State v. McFetridge 84 Wisc. 473, 54 N. W. R. 1, 998; and State v. Hill (Nebraska) 66 N. W. R. 541.

As we have heretofore observed, the Supreme Court of the United States in the case of Merrill v. Jacksonville National Bank, *supra,* adopted the so-called English Chancery Rule by a divided court; five members of the court favored the adoption of that rule, while four members of the court dissented and favored the adoption of the so-called Bankruptcy Rule, and it appears that that court has since that time followed the majority opinion as the law as settled by the opinion in that case. We do not think we are bound to follow that court in this case, however, because the facts are not identical and also because State courts are not bound to follow Federal courts except in determination of Federal questions, and the courts of the last resort in quite a number of the States have declined to follow this decision and adopt the rule as therein enunciated, some of which are Washington, New Jersey, Ohio, Massachusetts, Tennessee, Maryland, Iowa, Kansas and Georgia.

In Union & Planters Bank v. Duncan, 84 Miss. 467, 36 So. R. 690, Mr. Chief Justice WHITFIELD, delivering the opinion of the Court, says:

"The question in this case is whether the secured creditor of this insolvent bank may prove and receive dividends upon the face of his entire claim—his whole

debt—without crediting his collaterals or collections made therefrom and without surrendering the said collaterals. It is a question upon which there is a great conflict in the authorities; but after the maturest consideration, we prefer the view that such secured creditor is not so entitled but must credit the value of the collaterals on the debt, and prove only for the balance. In view of the very able and very exhaustive consideration of this subject in the case of Merrill v. Nat. Bank of Jacksonville, 173 U. S. 131 (19 Sup. Ct. R. 360; 43 Law ed. 640), we deem it unnecessary to attempt any extended observations of our own. It is impossible for us to escape the conclusion that the better view is set forth in the opinion of the dissenting justices, delivered by Mr. Justice WHITE, and we adopt the reasoning of that opinion as our own. We make just a few observations: These collaterals passed by the assignment to the assignee. The fact that they were held as collateral to the debt did not change the fact that they were a mere security for the debt. The assignment provides that the distribution shall be ratable amongst the creditors. We think Mr. Justice WHITE demonstrates that 'the rule in bankruptcy did not depend upon express statutory requirement, but on the contrary, that it was simply a necessary outgrowth of the command of the statute that there should be an equal distribution of the bankrupt's assets.' As said by Justice WHITES 'True it is that, both in our own Act of 1867 and in the English bankrupt Act of 1869, there were inserted express provisions requiring a secured creditor to account for his collaterals before proving against the general assets. But this was but the incorporation into the statutes of the rule which had arisen as a consequence of the

requirement for a ratable distribution, and which had existed for hundreds of years before the statutes of 1867 and 1869 were adopted. In other words, the express statutory requirement only embodied in the form of a legislative enactment what theretofore from the earliest time had been universally enforced, because of the provision for a ratable distribution'. Mr. Justice WHITE further says: 'It was undoubtedly from a consideration of this fundamental rule of equity in construing the statutory requirements for ratable division of general assets, that the bankruptcy rule was formulated. That rule, however, in effect, declared that secured creditors might retain their preferential contract rights in particular portions of the estate of the insolvent debtor, but that it was the purpose of parliament, in commanding ratable distribution, that general assets—that is, assets disincumbered of liens—should be distributed only among the general or unsecured creditors—the necessary effect being that a secured creditor could not prove against general assets without surrendering his security, thus becoming a general or unsecured creditor for the whole amount of the debt, or realizing upon the security, or in some form accounting for its value, in which latter contingency he would be general or unsecured creditor only for the deficiency. That the bankruptcy rule was deemed to be founded upon equitable principles, I think is demonstrated by the statement of Lord Hardwicke in a case already mentioned (Broomley v. Goodere, 1 Atk. 77), where, after referring to the Act of 13 Elizabeth, ch. 7, he said: ''It is manifest that this Act intended to give the commissioners an equitable jurisdiction as well as a legal one, for they have full power and authority to take by their discretions such order

and directions as they shall see fit, and this has been the construction ever since; and, therefore, when petition have come before the chancellor, he has always proceeded upon the same rules as he would upon cases coming before him upon the bill—the rules of equity.'' As well said by Lord Chancellor Eldon: ''Till his debt has been reduced by the proceeds of that sale (that is, of the security), it is impossible correctly to say what the actual amount of it is.'' ' ''

This position is supported by National Bank v. National Merchants Bank, 80 Md. 371, 30 Atl R. 913; Doolittle v. Smith, 104 Iowa 403, 72 Pac. R. 867; First National Bank v. Mansfield State Bank, 127 Wash. 475, 221 Pac. R., 595; *in re* Fresch 5 Wash. 344, 31 Pac. R. 755; Blackman v. Pettingill 25 Idaho 307, 137 Pac. R. 182.

In Citizens & Southern Bank v. Alexander (Ga.), 92 So. E. R. 868, the court speaking through Mr. Justice GILBERT and referring to the case of Merrill v. National Bank of Jacksonville, *supra,* says:

''The majority opinion was delivered by Chief Justice FULLER, with whom concurred four associate justices, adopting the fourth, or what is known as the English chancery rule. This is the rule for which the plaintiff in error in this case contends. Mr. Justice WHITE, now chief justice, delivered a dissenting opinion, and with him concurred Mr. Justice HARLAN and Mr. Justice McKENNA; Mr. Justice GRAY also delivered a dissenting opinion. It is of interest to note that the rule adopted by the majority had previously been applied in the United States Circuit Court of Appeals in the case of Chemical National Bank v. Armstrong, 59 Fed. 372, 8 C. C. A. 155, 16 U. S. App. 4, 465, 28 L. R. A. 231, the court being composed of Mr.

Justice BROWN and Circuit Judges William Howard Taft and Horace Harmon Lurton, the last named afterwards becoming an associate justice of the Supreme Court of the United States. Mr. Justice WHITE, we think, has shown that 'inequality and injustice must arise from the application' of the chancery rule of distribution. The dissenting opinions of both Mr. Justice WHITE and Mr. Justice GRAY cite authority for their contention that the chancery rule had not been adhered to in England, either continuously from the beginning, or at the time of the decision in the Merrill case, *supra*. They further show that the rule at that time in England was that:

" 'A secured creditor can only prove for the balance which may remain after deduction of the proceeds or value of collateral security'."

And, continuing, Mr. Justice GILBERT gives expression to the opinion of the court as follows:

"It would be a work of supererogation, if not presumption, to argue this question, which has challenged and received the best thought and attention of the ablest judicial minds in the courts of last resort in England and in the United States. We merely add that, in our opinion, the chancery rule does not operate with equal justice among the secured and the unsecured creditors, nor among the different classes of secured creditors. It would give to one who held both secured and unsecured claims an unjust advantage or preference over one who held only an unsecured claim, which was not intended by the parties. The holder of both secured and unsecured claims would, in effect, obtain a benefit in behalf of his unsecured claim

by reason alone of having also a secured claim. It should be noted that only the correctness of the ruling of the trial court is reviewed in this case, as the record contains no issue as to the other principles stated in the four rules above quoted from the Merrill case, *supra.*"

The following cases will be found sustaining the rule as enunciated in the above quoted opinion: Baker v. Commonwealth Tobacco Co., 74 N. J. Equity 423, 75 Atl. R. 319; State v. Yellowstone Bank, Montana, 234 Pac. R. 813; Levy v. Chicago National Bank (Ill.), 42 N. E. R. 129; Wheat v. Dingle (S. C.), 11 So. E. R. 394, 8 L. R. A. 375.

We approve the language of Mr. Justice WHITE as expressed in the dissenting opinion in Merrill v. National Bank of Jacksonville, *supra,* in which he says:

"That the doctrine maintained by the court also tends to operate a discrimination as between secured creditors, in favor of the one holding collateral securities not susceptible of prompt realization is, I think, demonstrable. Thus a secured creditor who takes collaterals maturing on the same day with the debt owing to himself, which collaterals consist of negotiable notes, the makers of which and endorsers upon which are pecuniarily responsible, finds the collaterals promptly paid when deposited for collection, and if his debtor should become insolvent the day after payment the creditor could only claim for the residue of the debt still unpaid. On the other hand, a creditor of the same debtor, the debt to whom matures at the same time as that owing the other creditor, and is secured by collaterals also due contemporaneously, has the collaterals protested for non-payment, and when the debtor fails the collaterals have not been realized.

While the first debtor who had received first class collateral can collect dividends against the estate of his insolvent debtor only for the unpaid portion of the claim, losing a part of such residue by the inability of the estate to pay in full, the debtor who received poor collateral collects dividends out of the general assets on his whole claim, and, if he eventually realizes on his securities, may come out of the transaction without the loss of one cent. These illustrations, to my mind, adequately portray the inequality and injustice which must arise from the application of the rules of distribution now sanctioned by the court.''

And, further in the same opinion, the writer says:

''To resort, however, to reasoning for the purpose of endeavoring to demonstrate that where a statute does not allow preferences in case of insolvency, and commands a ratable distribution of the assets, a secured creditor can not be allowed to disregard the value of his security and prove for the whole debt, seems to me to be unnecessary, since that he can not be permitted to so do, under the circumstances stated, has been the universal rule applied in bankruptcy in England and in this country from the beginning.''

After a careful consideration of the case in the light of authority cited and of many others to which we have referred and not cited, we are constrained to hold that where a depositor in a State bank has obtained and received from such bank collateral security to protect the deposit and thereafter while the deposit in the bank exceeds the value of the securities held, the bank becomes insolvent and the depositor thereupon converts the securi-

ties so held into cash, he will be required to credit the bank account with the amount of the cash so received from the disposition of such securities and may thereupon file his claim with the receiver of the insolvent bank for the amount of the balance of the deposits. To hold otherwise would be to say that the depositor secured by pledged collaterals would not only have advantage of stockholders and depositors without security to the extent of the bank assets pledged to him to secure his deposit, but would receive the further advantage of a dividend from the remaining assets on a sum equal to the value of the securities so held by him. In this case each of the depositors would be allowed dividends from the remaining assets of the defunct bank on the respective sums which such depositors has already received in cash from the conversion of bank assets pledged to secure the deposit and this in addition to dividends in proportion to other depositors on the remainder of the deposit. This would be an advantage which we deem was neither contracted for nor contemplated when the deposits were made and the collaterals were pledged.

The orders overruling the demurrers are reversed and the cases remanded for further proceedings not inconsistent with this opinion. It is so ordered.

Reversed.

WHITFIELD, P. J., AND TERRELL, J., concur.

ELLIS, C. J., AND STRUM AND BROWN, J. J., concur in the opinion and judgment.