**UNITED REALTY TRUST, etc., Respondent,**

**First National Bank of Rochester, Rochester, Minnesota, Respondent,**

v.

**PROPERTY DEVELOPMENT AND RESEARCH COMPANY, et al., Respondents,**

**B. J. Loftsgaarden, Respondent,**

**Alvin A. Holasek, et al., Respondents,**

**Alotel Associates, Appellant,**

**John Hall, et al., Defendants.**

No. 47707.

Supreme Court of Minnesota.

July 28, 1978.

Gartner, Burkhardt, Shulman & Ekstrand, Rochester, for Alotel Associates and John Hall, et al.

Briggs & Morgan and Bonnil Berezovsky, St. Paul, for United Realty Trust.

Maslon, Kaplan, Edelman, Borman, Brand & McNulty and Marcy Wallace, Minneapolis, for United Realty Trust.

West, Gowan, DeBoer & McIntosh, Rochester, for First Nat. Bank of Rochester.

B. J. Loftsgaarden, St. Paul, for Property Development and Research and pro se.

Eugene A. O'Brien and Donald A. Wheat, Minneapolis, for Alvin A. Holasek, et al.

Minnesota Bankers Association, John S. Jackson, Minneapolis, amicus curiae.

Heard before ROGOSHESKE, KELLY and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant Alotel Associates (Alotel), a Minnesota limited partnership, claiming to be the true borrower in a defaulted $2,310,-000 loan transaction entered in 1973, appeals from the trial court's judgment ordering foreclosure and denying it the defense of usury by application of Minn.St. 334.01, subd. 2, as amended by L. 1974, c. 238, § 1, which exempts transactions of $100,000 or

more from the usury laws. Plaintiff lender, United Realty Trust of California (URT), cross-appeals from certain of the trial court's findings of fact, urging that the judgment be affirmed on the additional ground that the loan was exempt from usury laws because made to a corporate borrower within § 334.021. We hold that the trial court properly found the transaction exempted from the usury laws under § 334.01, subd. 2, as amended by L. 1974, c. 238, § 1, and without deciding the issues raised by the cross-appeal, we affirm the judgment of foreclosure.

Through an extended period of financial negotiations beginning sometime in 1972, the promoter, B. J. Loftsgaarden, through and with a number of existing or proposed corporations and business entities formed by him, sought to obtain financing for the construction of a Ramada Inn in Rochester, Minnesota. The proposed inn was to be constructed on land acquired for that purpose by Property Development and Research Company (PDR), a Minnesota corporation which had been formed by Loftsgaarden in 1962. During negotiations, a number of temporary commitments were entered by which First National Bank of St. Paul (First National) agreed to act as interim or construction lender and URT, then Larwin Realty Mortgage Trust, agreed to purchase the loan documents as permanent financer of the project. In each of the commitments entered, the parties attempted to restructure the proposed loan transaction in order to come within a statutory exemption to Minnesota's usury laws for corporate borrowers, which would enable Loftsgaarden legally to obtain the needed venture capital at a going rate of interest exceeding the 8-percent usury ceiling in Minnesota.

On September 11, 1973, a final commitment letter was signed whereby First National agreed to loan $2,310,000 to PDR, Loftsgaarden's corporation formed in 1962. By a sale and purchase agreement of the same date, URT agreed to purchase the note and mortgage from First National after construction of the inn. On October 24, 1973, PDR executed a note to First National for $2,310,000, and to secure the note, PDR gave a mortgage covering all of the real estate and improvements to be placed upon the land where the inn was to be built. The note provided for its subsequent assignment to URT. It provided for interest of 4 percent above prime rate payable to First National and for payments of principal and interest of 9½ percent after purchase of the note by URT for a period of 12 years, at which time the entire obligation would be repaid.

All of the loan proceeds were subsequently disbursed by First National with PDR's approval and used for three purposes: (1) Advances directly to materialmen and subcontractors, (2) discharge of a corporate obligation of PDR incurred in acquisition of the land, and (3) payment of PDR's interest obligation to First National. After construction of the inn was completed, URT purchased the note and mortgage from First National on December 11, 1974. Thereafter, defaults occurred and URT commenced this action to foreclose the mortgage.

Alotel's interest in the property and claims in this litigation arise out of a set of financial and legal relationships created by Loftsgaarden involving PDR, Alotel, and a number of other entities and individuals as part of his scheme for raising additional capital and for constructing and operating the inn. Alotel was formed by Loftsgaarden and functions in part to manage and operate the Ramada Inn.[1] While promoting the inn project, Loftsgaarden prepared and circulated a prospectus by which

---

1. At the time of the loan transaction in October 1973, Alotel Associates was composed of Loftsgaarden individually and Alotel, Inc., a corporation formed by Loftsgaarden solely to serve as a corporate partner and in which he is sole shareholder and officer. In September 1975, Loftsgaarden withdrew from Alotel Associates and was replaced as general partner by defendants John Hall and Wayne Boisen, of whom Boisen remained as general partner at the time of trial. Alotel, Inc., was removed as general partner at about the same time as Loftsgaarden withdrew.

interests in Alotel were publicly offered to individual investors, raising an additional $1 million in investment capital.

On October 24, 1973, the date of the note and mortgage from PDR to First National, PDR and Alotel entered a lease agreement whereby Alotel leased the subject real estate from PDR for a term of 29 years for use in construction and operation of the motel. Also on October 24, 1973, Alotel gave a secured installment note to PDR in the amount of $2,310,000 at 8-percent interest to be repaid in full within 13 years by October 1986. To secure this note, Alotel gave a mortgage on its leasehold interest in the property plus an assignment of rents to PDR. Rental payments under the lease were calculated to cover the difference between the 8-percent interest on the Alotel note to PDR and the 9½-percent rate on PDR's note to URT during the term of the installment note from Alotel to PDR, which was essentially the term of the First National-URT loan. The term of Alotel's lease, however, extended 16 years beyond the final repayment date of PDR's loan from First National and URT. Alotel thus functioned as an entity for raising additional investment capital, for operating and managing the inn, and for providing the funds to repay the long term loan presumably out of earnings from the inn.[2]

So long as Loftsgaarden remained a general partner in Alotel, Alotel continued to make monthly payments to PDR in accordance with its note and lease, and all principal and interest payments on the loan to URT were made by the borrower, PDR, from its corporate checking account. After Loftsgaarden withdrew from Alotel in September 1975, Alotel made no further lease payments to PDR, but Loftsgaarden's successor as general partner of Alotel made loan payments directly to URT until default occurred. PDR and Alotel continued to recognize each other's existence as separate entities. When Alotel discontinued paying rent to PDR, PDR brought an unlawful detainer action seeking to regain possession of the real estate under the lease. That action was settled.[3]

URT brought this action to foreclose the mortgage in July 1976. In this action Alotel and individual defendants John Hall and Wayne Boisen, successors to Loftsgaarden as general partner of Alotel, claimed to be the true borrowers and interposed the defense of usury. They alleged that the loan was made in fact to Alotel; that PDR was a mere conduit for the loan funds in an attempt to evade the usury laws; that the 9½-percent rate of interest, exceeding Minnesota's 8-percent limit for loans to individuals, was usurious; and that the entire transaction was therefore void under §§ 334.01, subd. 2, and 334.03 and URT should have no interest in the mortgaged property. After several days of trial, the trial court, sitting without a jury, found that PDR was in fact a mere corporate cloak for a loan to individuals and that all the elements of usury, including the critically disputed element of intention to evade the usury laws, had been proved. The court held, however, that an amendment to Minnesota's usury statute exempting from usury limits all loans of over $100,000, passed after the loan was first made by First National but before assignment of the note and mortgage to URT, applied to make this transaction nonusurious. Judgment was entered directing the foreclosure of the mortgage and sale of the

---

2. As additional means of raising capital, Loftsgaarden obtained a second loan from First National of St. Paul to PDR, which was repaid; secured a separate loan from First National Bank of Rochester, Rochester, Minnesota, to PDR; and arranged a sale of PDR's fee interest in the real estate on a contract for deed to Alvin A. Holasek and Ward E. Holasek, defendants. Loftsgaarden also organized and was sole shareholder, president, and director of 2361 Building Corp., which functioned as general contractor for the construction of the Ra-

mada Inn. These transactions and entities are not immediately at issue on this appeal.

3. An initial settlement would have given PDR restitution of the premises. After the trial court suggested that such a settlement could affect Alotel's standing to assert the defense of usury as claimed borrower in URT's foreclosure action, however, Alotel and PDR renegotiated their settlement to dismiss the unlawful detainer action.

property in satisfaction of the indebtedness due URT.

Alotel appeals from the judgment, seeking reversal and an order setting aside the foreclosure sale which was held subsequent to judgment and through which URT has become fee owner of the real estate.[4] URT cross-appeals from the trial court's findings that the loan was usurious and not made in form and in fact to a corporation.[5]

The loan transaction between PDR, First National, and URT was entered in Minnesota and, by express agreement of the parties, is governed by Minnesota law. Under § 334.03, the note and mortgage were void if the loan was usurious, and URT would have no interest in the mortgaged property and no right to either interest accrued or principal. *Phalen Park State Bank v. Reeves*, Minn., 251 N.W.2d 135 (1977). Under § 334.01, the legal rate of interest on any loan not exempted from the usury laws may not exceed 8 percent. The trial court found that all of the elements of usury were present in the transaction before us involving a loan of $2,310,000 at 9½-percent interest,[6] and the note and mortgage would be void unless the loan comes within one of the statutory exemptions to the usury laws stated in c. 334. The relevant exemptions upon this record are contained in § 334.01, subd. 2, as amended by L. 1974, exempting all loans of over $100,000, and § 334.021, making the defense of usury unavailable to a corporate borrower.

We hold that the trial court properly applied § 334.01, subd. 2, to find the defense of usury unavailable to avoid the borrower's obligation under the present $2,310,000 loan contract.

Section 334.01, subd. 2, provides:

"A contract for the loan or forbearance of money, goods, or things in action, in the amount of $100,000 or more, shall be exempt from the provisions of this section and the interest for such an indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing. This subdivision expires July 1, 1978. A contract for a loan or forbearance made on or before July 1, 1978 at a rate of interest not in excess of the rate of interest authorized by this subdivision at the time the loan or forbearance was made shall continue to be enforceable in accordance with its terms until the indebtedness is fully satisfied."

This provision exempting loans of over $100,000 was first enacted by amendment to § 334.01 in 1974 and continued by further amendment in 1975. While First National and URT entered the present transaction in 1973, URT's enforcement action was not brought until 1976. Alotel argues that the trial court erred in applying § 334.01, subd. 2, to exempt a transaction entered before enactment of that statutory amendment be-

---

4. Since appellants filed no supersedeas bond to stay foreclosure proceedings pending appeal, the foreclosure sale was held on May 13, 1977. URT purchased the property at the sale, bidding in the entire indebtedness and leaving no deficiency against the borrower, the loan having been nonrecourse. The 6-month redemption period fixed by the judgment expired November 13, 1977, and there was no redemption.

5. URT also argued that the appeal should be dismissed as moot since appellant Alotel's rights in the property have already been terminated and the judgment satisfied by the foreclosure sale at which URT acquired fee ownership of the real estate. As URT acknowledged at oral argument, these events pending appeal have not deprived this court of power to give effective relief, including invalidation of the foreclosure sale if indicated, in a case such as this where there is no innocent third-party pur-

chaser whose rights could be prejudiced. Accordingly, we find the mootness argument to be without merit.

6. In *Schawman v. Solmica Midwest Inc.*, 283 Minn. 437, 168 N.W.2d 667, 669 (1969), we said that a transaction is usurious if the court finds "(a) loan of money or forbearance of a debt; (b) an agreement between the parties that the principal shall be payable absolutely; (c) the exaction of a greater amount of interest or profit than is allowed by law; and (d) the presence of an intention to evade the law at the inception of the transaction." The trial court found each of these elements present in the transaction concerned here. URT's cross-appeal vigorously challenges the finding that URT had an intention to evade the law at the inception of the transaction. We do not reach this evidentiary issue.

cause the legislature did not specifically provide for retroactive application of that provision, and § 645.21 provides that "[n]o law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature." Alotel also cites a number of case authorities applying the general presumption against retroactive legislation in contexts other than the repeal or statutory amendment of usury laws.

URT argues that the trial court ruled correctly because the presumption against retroactivity does not exist where the legislature removes a formerly applicable penalty such as that provided by usury laws, and because the right to assert the defense of usury is not a vested right, being of a penal nature.[7]

The general rule that repeal of a penal law releases the penalty imposed as to all actions initiated after repeal was early applied in the context of usury laws by the United States Supreme Court in its only expression on this subject. *Elwell v. Daggs*, 108 U.S. 143, 2 S.Ct. 408, 27 L.Ed. 682 (1883). In *Elwell*, the lender brought suit to foreclose a mortgage securing a note which was usurious when made under Texas' usury statute. That statute, like Minn.St. 334.03, made usurious loan documents void. After the loan was made but before the suit to foreclose, Texas passed a constitutional amendment repealing all of its usury laws. The borrower claimed the defense of usury, arguing that the loan was usurious when made, that the law at the time of making the loan should govern, and that the repeal of the usury laws should not be given retroactive effect. The Supreme Court held that usury laws are penal in nature and that the repeal of such laws without a saving clause operates retrospectively, cutting off the defense of usury in all future actions, even upon contracts previously entered. Giving such effect to the repeal of the usury laws denies no party of a vested right. The Supreme Court rejected an argument that the rule of retroactivity should apply only to the repeal of usury laws which had made usurious transactions voidable as distinguished from void. Despite the fact that the Texas usury statute, like Minn.St. 334.03, had declared usurious contracts void, the Supreme Court looked to the state of the law at the time of enforcement, under which the defense of usury was unavailable even as to loan contracts previously entered.[8]

---

7. URT also argues that application of the 1974 amendment to this transaction need not be considered retroactive because Federal law governed the loan when first made by First National and Minnesota law did not attach until the assignment of note and mortgage to URT after passage of the amendment. We do not find this argument persuasive. It is true that the penalty to be applied for a usurious loan by a national bank is governed by 12 U.S.C. § 86 prescribing a forfeiture of interest rather than the forfeiture of all principal and interest required by state law under § 334.03. Under 12 U.S.C. § 85, however, it is state law which governs the rate of interest chargeable by a national bank and which determines whether the transaction is usurious. Upon entering this transaction, all the parties expressly agreed to be governed by Minnesota law. Thus, although URT did not purchase the note and mortgage until after passage of the statutory amendment, Minnesota's usury laws were applicable to this transaction from the beginning. Both URT and the national bank entered their commitment to this transaction in September 1973 before passage of the usury exemption contained in § 334.01, subd. 2.

8. In *Elwell v. Daggs*, 108 U.S. 143, 151, 2 S.Ct. 408, 413, 27 L.Ed. 682, 685 (1883), the Supreme Court said: "* * * [T]he right of a [borrower] to avoid his contract is given to him by statute, for purposes of its own, and not because it affects the merits of his obligation; and that whatever the statute gives, under such circumstances, as long as it remains *in fieri*, and not realized by having passed into a completed transaction, may, by a subsequent statute, be taken away. It is a privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract. The benefit which he has received as the consideration of the contract, which, contrary to law, he actually made, is just ground for imposing upon him, by subsequent legislation, the liability which he intended to incur. That principle has been repeatedly announced and acted upon by this court. * * *

"The right which the curative or repealing act takes away in such a case is the right in the party to avoid his contract, a naked legal right which it is usually unjust to insist upon, and which no constitutional provision was ever designed to protect."

■ The rule of *Elwell* is consistent with principles previously announced in earlier decisions of this court. We have recognized that usury laws, which enable the borrower in certain cases to escape a contractual obligation he had entered, are penal in nature and are to be strictly construed. See, *Seebold v. Eusterman*, 216 Minn. 566, 13 N.W.2d 739 (1944). The legislature has the power retroactively to validate a contract previously invalid so long as it does not interfere with a vested right. *Calderwood v. Jos. Schlitz Brewing Co.*, 107 Minn. 465, 121 N.W. 221 (1909); *Jenkins v. Union Savings Assn.*, 132 Minn. 19, 155 N.W. 765 (1916). See Minn.St. 645.35. We have said that "[a] person has no vested rights in the defense of usury." *Jenkins v. Union Savings Assn.*, 132 Minn. 22, 155 N.W. 766.

■ While the normal presumption against retrospective application of laws has been applied in some jurisdictions to preserve repealed usury penalties as to transactions entered before repeal,[9] a significant number of jurisdictions apply the rule of *Elwell*.[10] As stated by the Arizona Supreme Court in *American Sav. Life Ins. Co. v. Financial Affairs Management Co., Inc.*, 20 Ariz.App. 479, 484, 513 P.2d 1362, 1367 (1973):

"* * * [T]he [usury] statute creates a privilege in the borrower, that privilege being the ability to avoid paying the interest he has previously agreed to pay.

The modification of the statute removes the previously existing privilege to the extent of the modification. The privilege ends when that which creates it ends. It can hardly be contended that a borrower has a vested right in this privilege to avoid obligations he has previously voluntarily assumed. As the United States Supreme Court stated in *McNair v. Knott*, 302 U.S. 369, 58 S.Ct. 245, 82 L.Ed. 307 (1937):

" 'Placing the stamp of legality on a contract voluntarily and fairly entered into by parties for their mutual advantage takes nothing away from either of them. No party who has made an illegal contract has a right to insist that it remain permanently illegal. Public policy cannot be made static by those who, for reasons of their own, make contracts beyond their legal powers. *No person has a vested right to be permitted to evade contracts which he has illegally made.*' 302 U.S. 369 at 373, 58 S.Ct. 245 at 247. (Emphasis added; footnote omitted.)"

We find this view the more persuasive. A statutory repeal or modification of a usury statute abates the repealed penalty or forfeiture as to all transactions sought to be enforced thereafter, including transactions entered before the repeal.[11] This rule is consistent with the modern view abhorring forfeitures [12] and with the increasing disfa-

**9.** See, e. g., *Hockley Co. Seed & Delint v. Southwestern Inv. Co.*, 476 S.W.2d 38 (Tex.Civ. App.1971); *In re Parkwood, Inc.*, 149 U.S.App. D.C. 67, 461 F.2d 158 (1971); *American Timber & Trad. Co. v. First National Bank of Oregon*, 511 F.2d 980 (9 Cir. 1974). Alotel also cites a number of older authorities from Georgia and Nebraska caselaw. The older Nebraska cases, however, are no longer of precedential value, since the Nebraska court has reversed its earlier position and now follows the rule of *Elwell v. Daggs*, footnote 8, *supra*. See cases cited in footnote 10, infra.

**10.** See, e. g., *American Sav. Life Ins. Co. v. Financial Affairs Management Co., Inc.*, 20 Ariz.App. 479, 513 P.2d 1362 (1973), and authorities cited therein; *Fenton v. Markwell & Co.*, 11 Cal.App.Supp.2d 755, 52 P.2d 297 (1935); *Iowa Savings & Loan Assn. v. Heidt*, 107 Iowa 297, 77 N.W. 1050 (1899); *Deposit Guaranty Bank & Trust Co. v. Williams*, 193

Miss. 432, 9 So.2d 638 (1942); *In re Champion Shoe Machinery Co.*, 17 F.Supp. 985 (E.D.Mo. 1937); *White Motor Co. v. Reynolds*, 179 Neb. 91, 136 N.W.2d 437 (1965); *Davis v. General Motors Acceptance Corp.*, 176 Neb. 865, 127 N.W.2d 907 (1964).

**11.** While the Arizona Supreme Court in *American Sav. Life Ins. Co. v. Financial Affairs Management Co., Inc.*, footnote 10, *supra*, placed some emphasis on the fact that the usury statute applicable before repeal did not expressly void the parties' usurious transaction in that case, we follow the reasoning of the United States Supreme Court in *Elwell v. Daggs*, footnote 8, *supra*, and attach no significance to a theoretical distinction between previously void or previously voidable contracts in this context.

**12.** Application of the usury penalty here would result in complete forfeiture of all principal and interest under Minn.St. 334.03, and *Phalen*

vor among legislators and commentators toward usury penalties in the context of commercial loans made for business purposes. See, e. g., Minn.St. 334.011, now exempting from the 8-percent usury limit all loans made for business or agricultural purposes. See, generally, Oeltjen, *Usury: Utilitarian or Useless?*, 3 Fla.St.U.L.Rev. 169 (1975); Hershman, *Usury and the Tight Mortgage Market—Revisited*, 24 Bus. Lawyer 1121; Shanks, *Practical Problems in the Application of Archaic Usury Statutes*, 53 Va.L. Rev. 327.

Section 334.01, subd. 2, as amended in 1974, clearly had the effect of repealing the penalties of the usury statutes as to all loan transactions of over $100,000. Under the rule which we adopt, the repeal was effective as to all such transactions sought to be enforced after the effective date of this amendment. It follows, as the trial court correctly determined, that the claim of usury was not available as a defense to URT's 1976 action to foreclose the mortgage securing a $2,310,000 loan.

2. Having found this loan exempted from the usury laws under § 334.01, subd. 2, we find it unnecessary to rule upon URT's significant claims that there was insufficient evidence to support the trial court's findings that the loan was made in fact to individual borrowers with an intention of evading the usury laws, and that as a matter of law the loan was made in form and in fact to a corporation so as to be exempted also under § 334.021. See, *Dahmes v. Industrial Credit Co.*, 261 Minn. 26, 110 N.W.2d 484 (1961); *Jenkins v. Moyse*, 254 N.Y. 319, 172 N.E. 521 (1934); Annotation, 63 A.L.R.2d 924; Portman, *Using a "Dummy" Corporate Borrower Creates Usury and Tax Difficulties*, 28 S.W.L.J. 437; Shanks, *Practical Problems in the Application of Archaic Usury Statutes*, 53 Va.L. Rev. 327; Comment, 15 Minn.L.Rev. 112.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.

*Park State Bank v. Reeves*, Minn., 251 N.W.2d 135 (1977), as contrasted with lesser statutory penalties for usury involved in several of the cases applying the rule urged by Alotel. See, footnote 9, *supra*.