THOMAS A. RYAN AND PATRICIA J. RYAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ryan v. Commissioner
Docket Nos. 42105-84; 42203-84; 191-85.
United States Tax Court
T.C. Memo 1988-12; 1988 Tax Ct. Memo LEXIS 12; 54 T.C.M. (CCH) 1503; T.C.M. (RIA) 88012; January 7, 1988; As amended January 11, 1988 Lee N. Johnson, for the petitioners. Jack A. Forsberg, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in statutory notices of deficiency dated October 5, 1984, determined deficiencies *13 in petitioners' income taxes for 1978 as follows: Ryan
$ 34,563.00
O'Brien
25,313.61
Lamm
11,847.82
This action concerns the correct period for realizing income upon the foreclosure of property subject to nonrecourse debt owned by the Alotel Associates partnership, in which each of the petitioners were partners. The sole issue for our consideration is whether 1978 was the correct year to report this income, the year in which the Minnesota Supreme Court adversely decided the partnership's appeal. FINDINGS OF FACT At the time of filing the petitions in these cases, petitioners resided at the following locations: [2]
Thomas A. and Patricia J. Ryan - Long Lake, Minnesota
Eugene A. and Mary K. O'Brien - Minneapolis, Minnesota
Donald H. and Frances G. Lamm - Minneapolis, Minnesota
The facts have been fully stipulated by the parties. The stipulated facts and exhibits are incorporated herein by this reference. Alotel Associates (Alotel) was a Minnesota limited partnership organized in August of 1973. The original general partners of Alotel were B. J. *14 Loftsgaarden (Loftsgaarden) and Alotel, Inc., a Minnesota corporation wholly owned by Loftsgaarden. [3]
As originally organized, Alotel had 20 limited partnership units. The number of limited partnership units was subsequently expanded to 25. During the year in issue there were 25 outstanding limited partnership units in Alotel. In 1973, the petitioners Thomas A. Ryan, Eugene A. O'Brien, and Donald H. Lamm purchased, for the amounts indicated, the following number of limited partnership units: Thomas A. Ryan
$ 52,500
1.5
Eugene A. O'Brien
35,000
1  Donald H. Lamm
35,000
1  Except to the extent of certain cash proceeds and distributions, as set forth in Alotel's articles of partnership, all profits and losses were allocable to the limited partners. Profits and losses were allocated among the limited partners pro rata based on the number of limited partnership *15 units owned by the respective partners. Alotel was an accrual method, calendar year partnership. Alotel was organized to operate a Ramada Inn motel being promoted by Loftsgaarden. The proposed motel was to be constructed in Rochester, Minnesota, on land (motel site) acquired for that purpose by Property Development and Research Company (PDR). PDR was a Minnesota corporation wholly owned by Loftsgaarden. In 1973, Alotel obtained a license from Ramada Inns, Inc., to operate the proposed motel. The license had an initial term of 20 years. In late 1972, Loftsgaarden began negotiating with United Realty Trust (URT), formerly Larwin Realty and Mortgage Trust, for long-term financing of the motel. In early 1973, URT made a preliminary commitment to loan funds to Alotel at an interest rate of 9-1/2 percent. URT was subsequently advised by its counsel that the proposed loan would violate Minnesota's then-existing usury law. In order to circumvent the usury statute, the parties restructured the transaction by funneling the financing for the project through Loftsgaarden's corporation, PDR. [4] The First National Bank of St. Paul (First St. Paul) provided interim construction financing *16 for the motel. By a sale and purchase agreement dated September 11, 1973, URT agreed to purchase the loan from First St. Paul once construction of the motel was completed. On October 24, 1973, PDR executed a nonrecourse installment not to First St. Paul in the principal amount of $ 2,310,000 (first mortgage note). The first mortgage note provided for interest at 4 percent above the prime rate until purchased by URT and 9-1/2 percent thereafter. PDR also executed a Mortgage and Security Agreement with Assignment of Rents (first mortgage) to secure payment of the first mortgage note. The collateral covered by the mortgage included the motel site, all buildings and improvements to be placed on the site, all fixtures to be used in connection with operating the motel, and all promissory notes from Alotel to PDR. First St. Paul assigned the first mortgage note and the first mortgage to URT on December 11, 1974. On October 24, 1973, PDR and Alotel entered into a lease agreement (lease) whereby Alotel leased the motel site from PDR for and initial term of 40 *17 years, with options to extend the lease for two additional 15-year terms. PDR loaned Alotel $ 2,310,000, represented by a secured installment note and a security agreement. The collateral covered by the security agreement included all furniture, fixtures and equipment used in connection with the operation of the motel, improvements to the motel site, and the franchise agreement with Ramada Inns, Inc. The note provided for interest at the rate of 8 percent. [5] The rental payments under the lease were calculated to make up the difference between the 8-percent interest PDR received on the note from Alotel and the 9-1/2 percent interest it paid on the first mortgage note. The loan funds ($ 2,310,000) received by PDR from First St. Paul, and in turn by Alotel from PDR, were disbursed at Loftsgaarden's direction to the motel's general contractor, 2361 Building Corporation, was a corporation wholly owned by Loftsgaarden. Payments on the first mortgage note were made by Loftsgaarden in the name of PDR until September of 1975. Thereafter, *18 Alotel made the payments on the first mortgage note directly to URT. Although Alotel was not primarily liable under the terms of the first mortgage note and first mortgage, First St. Paul, URT, PDR and Alotel regarded Alotel as the primary obligor on the loan and looked to Alotel for payment of the loan. On December 31, 1973, PDR sold the motel site, by contract of deed, to Alvin Holasek and Ward Holasek (Holaseks), and simultaneously leased it back (second lease). [6] The contract of sale called for a large down payment and periodic payments intended to cover the rental payments due the Holaseks under the second lease. PDR also executed second mortgage notes to the Holaseks in the amounts of $ 66,666.67 and $ 33,333.33, respectively. These notes were secured by a second mortgage on the motel site. Both the contract for deed and second mortgage expressly stated that the Holaseks' interests were subordinate to URT and the chattel mortgage (described below) and subject to the lease between Alotel and PDR. *19 On or about May 1, 1974, construction of the motel was completed and the motel opened for business. Alotel operated the motel. In June of 1974, the First National Bank of Rochester (First Rochester) agreed to loan PDR $ 240,000. On June 20, 1974, PDR executed a promissory note to First Rochester in the principal amount of $ 240,000 (First Rochester note). PDR also executed a security agreement (chattel mortgage) pledging certain fixtures and personal property (Rochester collateral) used in the operation of the motel as security for the First Rochester note. First St. Paul and URT subordinated their liens on the Rochester collateral to the lien of First Rochester. No payments were made on either the first mortgage note or the First Rochester note after April of 1976. In July of 1976, URT brought an action in state district court to foreclose the first mortgage. At approximately the same time First Rochester brought a replevin action in the state district court based on the chattel mortgage. The two actions were subsequently consolidated. As a defense to the foreclosure of the first mortgage, Alotel alleged that the first mortgage note was usurious and void under Minnesota *20 law as (1) PDR had been the nominal obligor on the note for purposes of circumventing Minnesota's usury law, (2) Alotel was the true obligor on the note, thus (3) the 9-1/2 percent interest rate on the first mortgage note exceeded the 8-percent limit established by Minnesota law for loans to individuals. The consolidated cases were tried without a jury in late 1976 and early 1977. On March 18, 1977, the trial court issued its Findings of Fact, Conclusions of Law, and Order for Judgment. On March 25, 1977, the trial court issued its Amended Judgment and Memorandum. In its findings of fact, the trial court found that: (1) The loan secured by the first mortgage had been structured to circumvent Minnesota's usury law; (2) First St. Paul and URT had intended to extract a usurious rate of interest; (3) Alotel had been regarded by all the parties involved as the primary obligor on the loan; (4) Alotel had standing to raise the defense of usury; and (5) the loan extracted interest in excess of the legal rate chargeable to individuals at the time the transaction was entered into. However, based on an amendment to Minnesota's usury law made after the execution of the loan, exempting loans *21 in excess of $ 100,000 from the interest rate restrictions, the trial court held that the loan was not usurious or void. [7]
The trial court's amended judgment awarded First Rochester immediate possession of the collateral and provided that First Rochester could dispose of the collateral in any commercially reasonable manner. The court's amended judgment also held that Alotel, PDR and Loftsgaarden were jointly and severally liable for the loan, and stated that URT could foreclose on the first mortgage by sheriff's sale. On April 12, 1977, Alotel filed a notice of appeal of the trial court's Amended Judgment to the Minnesota Supreme Court. Additionally, Alotel filed a motion with the trial court seeking an order waiving any supersedeas bond during the pendency of the appeal and staying the scheduled sheriff's sale. By order dated April 25, 1977, the trial court denied Alotel's motion on the ground that the perfection of Alotel's appeal had deprived the trial court of jurisdiction. On April 26, 1977, Alotel applied to the *22 Minnesota Supreme Court for a stay of all actions by creditors, a determination of the trial court's jurisdiction to order a supersedeas bond, and a determination of the amount, if any, of the supersedeas bond to be required. By order filed April 28, 1977, the Minnesota Supreme Court denied Alotel's application for an order determining the amount of the supersedeas bond. The Supreme Court's order remanded the case to the trial court for a determination, pursuant to Rule 108 of the Minnesota Rules of Civil Appellate Procedure, of the amount and form of the supersedeas bond to be required. By an Order Setting Amount of Supersedeas Bond and Providing Stay of Proceedings filed on May 5, 1977, the trial court ordered that all proceedings would be stayed, pending Alotel's appeal, only upon Alotel's filing with the court by May 11, 1977, a supersedeas bond in the amount of $ 350,000. Alotel never filed a supersedeas bond. The collateral securing the first mortgage was sold by sheriff's sale on May 13, 1977. URT, the sole bidder at the sale, purchased the property for the amount of the indebtedness due under the first mortgage note. Under the trial court's amended judgment and Minnesota *23 Statutes sections 580.23 and 581.10, Alotel, PDR, and Loftsgaarden, first, and the Holaseks, second, had 6 months from the date of the sheriff's sale to redeem the property to the extent of their interests. Neither Alotel, PDR, Loftsgaarden nor the Holaseks redeemed the property. On May 13, 1977, First Rochester removed from the motel its collateral under the chattel mortgage. First Rochester's collateral was sold at a private sale on May 24, 1977. The removal of the collateral from the motel left it in an unusable state. Without a substantial investment in fixtures and repairs the motel was inoperable. Alotel could not provide such investment. On appeal to the Minnesota Supreme Court, Loftsgaarden, PDR and Alotel contended that the trial court had erred in holding that the first mortgage note was not usurious and void and sought an order from the Supreme Court setting aside the sheriff's sale. URT cross-appealed from the trial court's findings that Alotel was the true obligor and that the loan was usurious under Minnesota law as it existed at the time the parties entered into the transaction. Also, URT argued that the appeal had been rendered moot by the sheriff's sale. *24 In July of 1978, the Supreme Court upheld the trial court's judgment. Footnote 5 of the Supreme Court's opinion stated: URT also argued that the appeal should be dismissed as moot since appellant Alotel's rights in the property have already been terminated and the judgment satisfied by the foreclosure sale at which URT acquired fee ownership of the real estate. As URT acknowledged at oral argument, these events pending appeal have not deprived this court of power to give effective relief, including invalidation of the foreclosure sale if indicated, in a case such as this where there is no innocent third-party purchaser whose rights could be prejudiced. Accordingly, we find the mootness argument to be without merit. [United Realty Trust v. Property Development and Research Co.,269 N.W. 2d 737, 741 (Minn. 1978).]
Footnote 12 of the Court's opinion further stated: Application of the usury penalty here would result in complete forfeiture of all principal and interest under Minn. St. 334.03 and Phalen Park State Bank v. Reeves * * * [United Realty Trust v. Property Development and Research Co., supra at 743, 744.] Upon audit *25 of petitioners' 1978 tax returns in 1981, the Internal Revenue Service proposed additions to income because of discharge of partnership indebtedness upon the foreclosure sale and subsequent disposition of the appeal by the Minnesota Supreme Court. Petitioners filed administrative protests contending, among other things, that the correct year for inclusion was 1977. OPINION In this proceeding we are asked to determine the proper year for inclusion of an item of income. Alotel was on the accrual method of accounting. An accrual basis taxpayer includes an item in income in the year "all events have occurred which fix the right to receive such income * * *." Sec. 1.451-1(a), Income Tax Regs.
Upon the foreclosure of the first mortgage, a sale or exchange occurred for tax purposes, and there is an amount realized equal to the nonrecourse indebtedness secured by the mortgage. Commissioner v. Tufts,461 U.S. 300 (1983). It is respondent's position that *26 the sale or exchange occurred in 1978, the year that the Minnesota Supreme Court affirmed the trial court's judgment in the foreclosure action. Petitioners, however, contend that the sale or exchange occurred in 1977, the year that the property was sold at sheriff's sale and the 6-month redemption period provided by Minnesota law expired. We agree with respondent. So long as an accrual basis taxpayer's right to an item of income is the subject of litigation, the item is not includible in the taxpayer's income. United States v. Safety Car Heating and Lighting Co.,297 U.S. 88 (1936). Both parties appear to agree on this general principle. However, petitioners argue that a bona fide contest and the availability of a viable remedy are necessary elements for an item to be subject to litigation. It is petitioners' position that Alotel's rights in the property were terminated after the redemption period expired. They contend that the Minnesota Supreme Court had no power to restore a property right in Alotel, because Alotel only had a leasehold interest that terminated by *27 default and by the repossession and the foreclosure action. Thus, no remedy was available. They argue that only the Holaseks could benefit from any restoration, because they were the fee-holders, and that the court could not impress a lease on the Holaseks' interest because they had not appealed and could not be bound by any judgment. [8]
Petitioners also rely on a line of cases holding that the "all events" test was satisfied prior to the termination of litigation when there was no longer any bona fide contest. Lutz v. Commissioner,396 F.2d 412 (9th Cir. 1968), revg. 45 T.C. 615 (1966), (litigation prosecuted by third parties did not prevent accrual of sales tax deductions by the taxpayers). See also Hollingsworth v. United States,568 F.2d 192 (Ct. Cl. 1977); Woodmont Terrace, Inc. v. United States,261 F. Supp. 789 (M.D. Tenn. 1966); *28 Dravo Corp. v. United States,348 F.2d 542 (Ct. Cl. 1965). Petitioners contend that although Alotel was conducting litigation, that part of the litigation concerning the "sale" and disposition of all interests in the Ramada Inn was concluded in 1977 by Alotel's failure to file a supersedeas bond. For the reasons stated below, we reject petitioners' arguments. One important fact must be repeated at the outset. Petitioners insist that there were two separate mortgages, one from URT to PDR, and the other from PDR to Alotel. The trial court, the Minnesota Supreme Court, and the parties in the stipulation agree that PDR was merely a conduit for circumventing Minnesota usury law. Alotel was in fact the obligor on the first mortgage and had standing to raise the defense of usury; Alotel stood to benefit had the defense succeeded. [9]
*29 In foreclosure situations, we have defined the taxable event in the following manner: [A] foreclosure sale, like a voluntary sale, is the definitive event that establishes gain or loss. [Citation omitted.] In the ordinary foreclosure action which has become final, however, the gain or loss is recognized "in the year in which the property is disposed of and the debt discharged. * * *"
Eisenberg v. Commissioner,78 T.C. 336, 344-345 (1982); R. O'Dell & Sons Co. v. Commissioner,169 F.2d 247 (3d Cir. 1948), affg. 8 T.C. 1165 (1947). This is because the foreclosure action is the amalgam of two separate events. First, there is an extinguishment of the underlying indebtedness, giving rise to income. Cf. secs. 108, 61(a)(12), I.R.C. 1954. Second, there is a disposition of the property securing the debt, a sale or exchange. The all events test requires both of these events to occur before income is realized. We find that neither event occurred before the Minnesota Supreme Court's final disposition of petitioners' *30 action. As a preliminary matter, we note that the language in Eisenberg refers to an action "which has become final." A foreclosure action that is being appealed is not "final" in the normal sense of that word. The debt must be discharged before there is realization of income from foreclosure. Both at the trial court and the appellate court level a usury defense was interposed by Alotel. Under section 334.03 of Minnesota statutes, a usurious contract is void. Thus, if the defense of usury had been validated at the Minnesota Supreme Court level there could have been no discharge of indebtedness because there would be no valid debt. [10]"If the mortgage is usurious, it is void and the bank has no right to either the interest accrued or principal." Phalen Park State Bank v. Reeves,312 Minn. 194, 251 N.W. 2d 135, 137 (1977); Midland Loan Finance Co. v. Lorentz,209 Minn. 278, 296 N.W. 911 (1941). For this reason, the Minnesota Supreme Court recognized that application *31 of the usury penalty would result in complete forfeiture of interest and principal. United Realty Trust v. Property Development and Research Co.,269 N.W. 2d 737, 743-744 n. 12 (Minn. 1978). While Alotel was not the primary obligor to URT under the instruments, the trial court found, and the Supreme Court accepted, that Alotel was the true obligor, and that Alotel had standing to raise the usury defense. Alotel was a true party in interest. Had the Minnesota Supreme Court found for Alotel on the usury issue, Alotel would have been relieved or any liability on the debt. [11] Because of these factors, we find that the validity of the indebtedness was still being litigated at the Supreme Court level, and it was not resolved until 1978. Safety Car Heating and Lighting Co. v. United States, supra.
*32 The other requirement for realization of income from foreclosure is that the property must be disposed of. The failure to file a supersedeas bond allowed the initial foreclosure sale to occur. In addition, the redemption period under Minnesota law had expired. See Minnesota Stat. sec. 580.23. However, as previously discussed, a usurious mortgage is void. Phalen Park State Bank v. Reeves, supra;Midland Loan Finance Co. v. Lorentz, supra.In such cases the mortgagee no longer has the right to the property used as security. Seebold v. Eustermann,216 Minn. 566, 13 N.W. 2d 739 (1944); Scott v. Reid,83 Minn. 203, 85 N.W. 1012 (1901). The Minnesota Supreme Court recognized this when it noted that it had the power to invalidate the foreclosure sale and that the foreclosure sale did not render the appeal moot. [12]United Realty Trust v. Property Development and Research Co., supra at 741 n. 5. Thus, the disposition of the property was also contested through Alotel's argument that the mortgage was void under Minnesota law. We hold, therefore, that the year the Minnesota Supreme Court issued its holding, *33 1978, is the proper year of inclusion. Safety Car Heating and Lighting Co. v. United States, supra.
Because we have found that Alotel was the true obligor, there was a bona fide contest concerning the validity of the debt, and Alotel would have benefited from the annulment of such debt had the appeal to the Minnesota Supreme Court succeeded. [13] Thus, even if we adopt petitioners' position regarding a bona fide contest and available remedy they would lose. Due to concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Eugene A. O'Brien and Mary Kay O'Brien, docket No. 42203-84; and Donald H. Lamm and Frances G. Lamm, docket No. 191-85. ↩
2. Petitioners' cases were consolidated for trial and opinion by order dated Aug. 8, 1985. ↩
3. In Sept. 1975, Loftsgaarden was replaced as the individual general partner of Alotel by John Hall. John Hall was subsequently replaced as the individual general partner by Wayne Boisen. Alotel, Inc., remained the corporate general partner of Alotel throughout the year in issue. ↩
4. The usury statute did not apply to situations involving corporate borrowers. Minn. Stat. sec. 334.021↩ (1973 Supp.). 5. Under Minnesota law, 8 percent was the maximum non-usurious rate of interest for non-corporate borrowing. Minn. Stat. sec. 334.01↩ (1973 Supp.). 6. The sale leaseback agreement is referenced in the contract of deed, but is not an exhibit in this case. No explanation is provided as to the status of the lease between Alotel and PDR when PDR apparently leased back the same property from the Holaseks. Alotel may have become something of a sublessee, but this is pure speculation. ↩
7. Minn. Stat. sec. 334.01 subd. 2 (1974). Under the Minnesota statute a usurious loan is void an unenforceable. Minn. Stat. sec. 334.03↩ (1973 Supp.). 8. Petitioners have failed to clarify the relationship between the Holaseks, PDR and Alotel. The Holaseks took the property subject to the Alotel lease, then subsequently leased the property back to PDR. See text at note 6, supra.↩ This lack of explanation would have been detrimental had we accepted petitioners' reasoning. 9. We think if such defense had succeeded, the Minnesota court would have also equitably invalidated the mortgage and indebtedness from PDR to Alotel, since the entire transaction was a sham to circumvent usury laws. In addition, because the lease from PDR to Alotel was merely a conduit to pass additional interest (the difference between 8 percent paid by Alotel to PDR and the 9-1/2 percent paid by PDR to URT), the Minnesota courts could have held that no additional rentals were due. ↩
10. See Tharp v. Commissioner,T.C. Memo. 1972-10, holding that a debt void under a state usury statute was not a "debt" for purposes of sec. 166, I.R.C. 1954↩. 11. Had the Minnesota Supreme Court found for Alotel on the usury issue, the legal and tax consequences would have been completely different. A finding that the underlying debt was void is clearly different from both the tax and legal perspective than a finding that there was a discharge of indebtedness accomplished by the purchase of the property by URT at the foreclosure sale (and the subsequent expiration of the redemption period). ↩
12. Moreover, we are charged with determining the tax consequences of this series of events and do not seek to invade the province or second guess the holding of state courts. The holding of the highest state court on a matter of state law is binding upon us. See Commissioner v. Estate of Bosch,387 U.S. 456↩ (1967). 13. Petitioners have not advanced any reason why Alotel appealed if they had nothing to gain by doing so. ↩