# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 15, 2013          Decided April 30, 2013

No. 12-5133

QUANTUM ENTERTAINMENT LIMITED,
A NEW MEXICO LIMITED LIABILITY COMPANY,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00047)

*Charles K. Purcell* argued the cause for appellant. With him on the brief was *Nancy J. Appleby*.

*Matthew Littleton*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *William J. Lazarus*, and *John L. Smeltzer*, Attorneys. *Tamara N. Rountree*, Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal involves questions of statutory retroactivity, which the court analyzes under the two-part test in *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Agreeing with the Interior Board of Indian Appeals, the district court ruled that Quantum Entertainment Limited's 1996 Management Agreement with the Santo Domingo Pueblo, a federally recognized Indian tribe, and its tribal corporation, Kewa Gas Limited, was null and void for lack of approval by the Secretary of the Interior as required by 25 U.S.C. § 81 (1994), and that it was incapable of being validated by the 2000 amendment to § 81, the application of which would be impermissibly retroactive. Quantum challenges the Board's determinations that application of the 2000 amendment would be impermissibly retroactive and that § 81 applies to the 1996 Agreement.

Application of *Landgraf*'s retroactivity test does not work in Quantum's favor. First, Congress made no clear statement that it intended the 2000 amendment to apply retroactively, *see* 511 U.S. at 280. Second, because the 1996 Agreement required Secretarial approval that was never obtained and the parties agree the Agreement would be valid without Secretarial approval under § 81 as amended, the application of the new law would give life to a null and void agreement, thereby attaching "new legal consequences" to it, *id*. at 269–70, 280. Although the Pueblo may have voluntarily undertaken the stated duties and liabilities under the Agreement, such an agreement was null and void without Secretarial approval before 2000. Since the Secretary never approved the Agreement, any legislative validation of the "duties" or "liabilit[ies]" attached to it was impermissibly retroactive. *Id*. at 280. Quantum's challenges to the scope of § 81 itself are unavailing. Accordingly, we affirm the grant of summary judgment, venturing no opinion on whether Quantum could recover in *quantum meruit*, an issue not briefed by the parties.

**I.**

On August 14, 1996, Quantum entered into an agreement with the Pueblo, acting through its Tribal Council, and Kewa Gas to manage, supervise, and operate Kewa Gas's gasoline distribution business on the Pueblo's reservation in New Mexico. Quantum is a limited liability company incorporated in the state of New Mexico, "engaged in, among other things, the business of managing gas distribution businesses." 1996 Agreement Recitals, C. Kewa Gas was chartered in 1996 by the Tribal Council of the Pueblo for the purpose of "carry[ing] on certain economic development activities on behalf of the Pueblo, including . . . operation of a gasoline distribution business," Tribal Council Res. No. S.D. 08-96-18 (Aug. 14, 1996); at the time of the Agreement it was registered as a distributor with the New Mexico Tax and Revenue Department, 1996 Agreement Recitals, A, B.

Under the terms of the Agreement, Quantum exercised nearly exclusive control over Kewa Gas's distribution business. It supervised "the general operations . . . including the purchase, marketing, sale and delivery of branded and unbranded gasoline and special fuels," and was to "[s]elect and train personnel," "[n]egotiate prices and coordinate deliveries," "[m]aintain proper and suitable records and books of account for" Kewa Gas, and "provide for normal repairs, replacements, and maintenance of equipment." Agreement, § 1.2(a)–(c), (e), (g). At a more general level, Quantum also "[d]evelop[ed] policies for the purpose of maximizing net income from the operations." *Id.* § 1.2(d). The Agreement included a provision for capital advances by Quantum for construction of physical assets although for "any construction to expand the Gas Distribution Business or . . . any capital expenditures costing in excess of $10,000," Kewa Gas's approval was required. *Id*. § 1.3. In return for the "day-to-day operation" of the business, Quantum received an annual management fee of 49% of Kewa Gas's "Net

Income," payable monthly, a fee of $0.03 per gallon of gasoline or diesel fuel sold to the Pueblo gas station, and a "performance bonus" of $0.005 per gallon for every gallon of fuel sold in excess of 1 million gallons per month. *Id.* §§ 2.1–2.3.

In addition to provisions for indemnification and settlement of disputes through binding arbitration, the Agreement included a non-compete clause. The Pueblo and Kewa Gas covenanted not to have any interest in any other gas distribution business within the State of New Mexico, except with respect to the retail operation of the tribe's Santo Domingo gas station (located adjacent to I-25 at the N.M. State Highway 22 exit). Quantum also agreed to a non-compete covenant, except for areas of the State that Quantum and Kewa Gas determined could not be economically serviced by Kewa Gas's gas distribution business. The initial term of the Agreement was for 10 years, with Quantum having the option to renew it for two additional 10-year terms, subject to a management fee of 44% in the first ten-year extension and 39% in the second.

By means of the Agreement the parties were able to benefit from a state tax exemption available to Indian Tribes. Kewa Gas, which was 100% owned by the Pueblo, was not subject to New Mexico's gasoline and special fuel tax. Although Kewa Gas was the distributor, and the incidence of the tax fell on the distributor not the purchaser, the State had concluded that the tax was preempted by federal law, exempting Kewa Gas from the payment of taxes on the receipt and sale of gasoline and special fuels to retail outlets in the State. *See* New Mexico Taxation and Revenue Dep't, Ruling No. 640-96-01 (Apr. 4, 1996) (citing *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450 (1995)). In 1999, the State replaced the exemption with a tax deduction for Indian tribal distributors like Kewa Gas for fuel sold from "a nonmobile storage container located within . . . [the] reservation . . . for resale outside . . . [the] reservation"

not in excess of 2,500,000 gallons per month.  N.M. Stat. Ann. § 7-13-4(f) (1999).

Restrictions on contracting with Indian Tribes have existed since 1872.  *See* S. REP. (COMM. INDIAN AFFAIRS) NO. 106-150 1, 7–8 (1999).   At the time of the 1996 Agreement, section 81 provided in part:

> No agreement shall be made by *any person* with *any tribe of Indians*, . . . in consideration of services for said Indians *relative to their lands*, . . . unless such contract or agreement be executed and approved as follows:
>
> . . .
>
> Second.  It shall bear the *approval of the Secretary of the Interior* and the Commissioner of Indian Affairs indorsed upon it.

25 U.S.C. § 81 (1994) (emphases added).  Congress amended this provision in 2000 to provide, in relevant part:

> No agreement or contract with an Indian tribe that *encumbers Indian lands for a period of 7 or more years* shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary.

25 U.S.C. § 81(b) (2000) (emphasis added).   (For ease of reference we henceforth refer to the former as "old § 81" and the latter as "new § 81.") The parties to this appeal stipulated that the 1996 Agreement would not require Secretarial approval under new § 81.

In 2003, after the Agreement had been operational for several years, a new Governor of the Pueblo Tribal Council advised the Bureau of Indian Affairs by letter that the 1996

Agreement had never been approved by the Secretary and that the Agreement was "far too lucrative" for Quantum. The Acting Regional Director determined that the Agreement was subject to the Secretary's approval under old § 81 and was not in the best interests of the Pueblo due to the high fees Quantum received under its terms; the Director declared the Agreement to have "never been legally valid" under old § 81, the law in effect at the time the parties entered the Agreement. Act'g. Reg'l Dir. Decision at 5 (Oct. 23, 2003). Upon Quantum's appeal, the Board of Indian Appeals agreed that the Agreement was not valid and that old § 81 applied, although it reached that conclusion for different reasons. The Board concluded that because the Agreement would have required Secretarial approval under old § 81 to be valid but would be valid without Secretarial approval under new § 81, applying new § 81 to the 1996 Agreement would have an impermissible retroactive effect of "rendering valid an otherwise invalid contract" and so would "alter the legal consequences of acts completed before New Section 81 was enacted." *Quantum Entertainment Ltd. v. Acting Sw. Reg'l Dir., Bureau of Indian Affairs*, 44 IBIA 178, 192–93 (2007) (citing *Landgraf*, 511 U.S. at 269–70 & n.23).

Quantum challenged the Board's decision in the district court. The district court granted Quantum's motion for summary judgment in part and remanded the case to the Board to explain the basis for its conclusion the Agreement was invalid. *Quantum Entertainment Ltd. v. U.S. Dep't of Interior*, 597 F. Supp. 2d 148, 156 (D.D.C. 2009). On remand the Board reaffirmed its conclusion and expanded its reasoning. *Quantum Entertainment Ltd. v. Acting Sw. Reg'l Dir., Bureau of Indian Affairs*, 52 IBIA 289 (2010). Upon Quantum's further challenge, the district court granted summary judgment to the Bureau of Indian Affairs. *Quantum Entertainment Ltd. v. U.S. Dep't of Interior*, 848 F. Supp. 2d 30, 32–33 (D.D.C. 2012).

## II.

Questions of statutory retroactivity are resolved under the two-part test established by the Supreme Court in *Landgraf*, 511 U.S. at 280. This test evolved from the Court's clarification of two lines of its precedent concerning the effect of intervening changes in the law when a statute does not specify its temporal reach. *See id.* at 264. "The first is the rule that 'a court is to apply the law in effect at the time it renders the decision.'" *Id.* (quoting *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974)). "The second is the axiom that '[r]etroactivity is not favored in the law,' and its interpretative corollary that 'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'" *Id.* (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Before examining these precedents, the Court in *Landgraf* observed that "retroactivity is a matter on which judges tend to have 'sound . . . instinct[s]' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* at 270 (internal citation omitted). Ultimately, however, the Court settled on a two-part test, instructing that:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine [1] whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine [2] whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption

teaches that it does not govern absent clear congressional intent favoring such a result.

*Id*. at 280.  In applying this test, the court owes no deference to the Board's retroactivity analysis under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See I.N.S. v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001); *Arevalo v. Ashcroft*, 344 F.3d 1, 9–10 (1st Cir. 2003).  Our review of the grant of  summary judgment is *de novo*, and "in a case like the instant one, in which the district court reviewed an agency action under the [Administrative Procedure Act]," this court "review[s] the administrative action directly, according no particular deference to the judgment of the district court." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 426, 440–41 (D.C. Cir. 2012) (capitalization changed).

Under the first part of the *Landgraf* test, the court must determine whether Congress has "express[ly] command[ed]" that new § 81 apply retroactively.  511 U.S. at 280.  Quantum acknowledges that "[t]he text of New Section 81 . . . does not explicitly extend the statute's reach to contracts antedating the statute's enactment." Appellant's Br. at 24.  Instead it urges the court to focus on new § 81's legislative history, which indicates concern about the uncertainty that old § 81 created with regard to existing contracts as well as the view that there was no longer a need for Secretarial oversight.  *See id.* at 24-25 (citing S. REP. NO. 106-150 at *7–*8).  Those contracts were vulnerable to *qui tam* actions challenging their validity absent Secretarial approval even after the parties had determined such approval was not necessary.  *See id*. (citing S. REP. NO. 106-150 at *7).

The legislative histories of new § 81 and old § 81 reveal that they had different purposes.  The 1999 Report of the Senate Committee on Indian Affairs included the statement that the paternalistic foundations on which old § 81 rested were no longer justified as a basis for federal policy.  *See* S. REP. NO.

106-150 at 7–8. In its opinion on remand the Board also examined the legislative history of old § 81 and the resulting case law, acknowledging that "paternalism, [the] guardian-ward relationship between the United States and tribal Indians, and the view that tribes and non-citizen Indians were incompetent to independently handle their business affairs" provided the historical context for Congress's enactment of old § 81. *Quantum*, 52 IBIA at 309. The enactment of new § 81 marked a move away from the concerns underlying old § 81.

Neither Quantum's nor the Board's review of the legislative history, however, reveals that Congress intended new § 81 to apply retroactively to preexisting agreements. At best, Quantum has identified statements in the Senate Report that are more probative of a concern with the need to repeal old § 81 than with the temporal reach of its amendment. Even assuming a committee report would be sufficient evidence of an "express command" by Congress, none appears in the Senate Report here. Quantum's cited judicial authority is also of no assistance to it; the cases track objections to "the paternalistic concern of a bygone era" while acknowledging that until Congress acts the courts are bound to apply old § 81. *See, e.g.*, *U.S. ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms*, 102 F. Supp. 2d 1154, 1163 (D.S.D. 2000) (quoting *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1218 (7th Cir. 1995) (Flaum, J., concurring). Absent an express prescription by Congress that new § 81 applies to existing agreements, we turn to the second part of the *Landgraf* test.

Under part two of *Landgraf*'s test, a court must hold that the application of a new statute is impermissibly retroactive only if it would "impair rights a party possessed when [it] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. To establish a baseline against which to evaluate any shifts in rights, liabilities, or duties that

might arise under new § 81, the Board looked to whether old § 81 imposed obligations on the parties when they entered the 1996 Agreement and how those obligations affected the validity of the Agreement. The Board concluded, as we do, that the Agreement required Secretarial approval when the parties entered into it and consequently new § 81 would attach new legal consequences to the Agreement between Quantum, the Pueblo, and Kewa Gas, by removing the impediment to its validity — i.e., the need for Secretarial approval. The Board explained:

> Under Old Section 81, there were no legal consequences whatsoever that attached to an Indian tribe through its execution of an agreement that fell within the scope of the statute, unless and until it was approved by the Secretary. To declare that New Section 81 retroactively renders valid and enforceable agreements that otherwise would remain null and void under Old Section 81 for lack of Secretarial approval would have the effect of imposing contractual obligations and liability on tribes (in this case on the Pueblo and Kewa) where no such obligations or liability had previous legal existence.

*Quantum*, 52 IBIA at 293. In the Board's view, applying new § 81 to validate an agreement that would have been null and void under old § 81 would have an impermissible retroactive effect.

For a different conclusion, Quantum relies on *McNair v. Knott*, 302 U.S. 369 (1937), and *Ewell v. Daggs*, 108 U.S. 143 (1883), as the "[c]ontrolling law," Appellant's Br. 26.[1] In

---

[1] The court requested post-argument briefing on the effect of 1 U.S.C. § 109, *see Landgraf*, 511 U.S. at 271, as a result of a question

*McNair*, 302 U.S. at 372–74, the Supreme Court held that a federal statute had validated an *ultra vires* pledge agreement by a Florida bank to secure public deposits despite the agreement having been made prior to enactment of the statute. And in *Ewell*, 108 U.S. at 148–149, 151, the Court held that a provision of the Texas Constitution repealing an anti-usury law had revived the obligations arising under a promissory note, which had been void because of its usurious interest rate. In *Ewell*, the Court drew a distinction between contracts that were "absolutely a nullity" and those that were "voidable merely," concluding that the usurious contract was only voidable because it was not *malum in se* and therefore could be resurrected by a subsequent statute. *Id*. at 149–150. To Quantum these cases establish an exception to the presumption against retroactivity because the enforcement of contracts like those in *McNair* and *Ewell* and the 1996 Agreement "creates no new legal obligations" — i.e., "it imposes nothing more than the liability inherent in the contract[s] [themselves], which the complainant[s] fully intended to incur." Appellant's Br. at 29 (internal quotation marks, citation, and alterations omitted).

Reliance on these cases is misplaced. First, old § 81 was enacted in a particular historical context oriented towards different concerns than those at issue in *McNair* and *Ewell*. Old § 81 was focused on ensuring the legal incapacity of the Indian tribes to contract on matters relative to their lands, a limitation informed by the belief that they were unable to resist the schemes of unscrupulous non-Indians seeking to swindle them out of their patrimony. *See* S. REP. NO. 106-150 at 7–8; *see also*

raised by the court during oral argument. Neither the Interior Department nor the United States relied on this provision in the course of the administrative and judicial proceedings. *See* U.S. Dep't of Justice letter to the Clerk, Feb. 20, 2013 at 4. We consider the issue waived. *See Coburn v. McHugh*, 679 F.3d 924, 930 (D.C. Cir. 2012); *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009).

FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 77 (1942). This notion of contracting incapacity emerged from a history of shameful misdeeds on the part of those dealing with Indian tribes that the limitations at issue in *McNair* and *Ewell* do not share. For this reason, the *Ewell* Court might have viewed an agreement entered into in violation of old § 81 "absolutely a nullity, in the sense that no right or claim can be derived from" it, rather than "voidable merely," and thus capable of being resurrected by a later statute. *Ewell*, 108 U.S. at 149.

Second, and more significantly, *McNair* and *Ewell* pre-date *Landgraf* and applied a different test for determining statutory retroactivity. In *Landgraf*, 511 U.S. 244, the Supreme Court's comprehensive examination of its prior cases did not result in a test that recognized an exception to the presumption against retroactivity where a new statute would, if applied to preexisting agreements, create new legal duties and obligations. But *McNair* and *Ewell* accepted just that: legally unenforceable agreements were transformed into valid ones that imposed previously non-existent obligations on the contracting parties. The Court's distinction in *Ewell* between contracts that are "absolutely a nullity" and those that are "voidable merely," as well as its endorsement of a presumption of retroactive application of the repeal of anti-usury laws, *Ewell*, 108 U.S. at 149, conflicts with the two-part test established in *Landgraf*. Under the *Ewell* framework, new legal consequences generated by a retrospective law repealing penal statutes of the kind in that case are not problematic. *Id*. at 150. Similarly, under *McNair*, 302 U.S. at 372, "validat[ing] transactions that were previously illegal" is also unproblematic. Under *Landgraf* this is not so, and *Landgraf*, not *McNair* nor *Ewell*, provides the controlling retroactivity test.

Under *Landgraf*, the application of new § 81 to the 1996 Agreement is impermissible because it would "increase [the Pueblo's] liability for past conduct" and "impose new duties

with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. That is, application of new § 81 would create "legal consequences" different from those that would result from application of old § 81. Under old § 81, the Agreement would be "*void ab initio* as a matter of law in the absence of Secretarial approval," *Quantum*, 55 IBIA at 316, and because applying new § 81 would transform the Agreement from void to valid, the presumption against retroactive legislation precluded the Board from applying new § 81 to the Agreement, *id*. at 293, 317.

To the extent considerations of fair notice, reasonable reliance, and settled expectations remain relevant to the retroactivity analysis, *see Martin v. Hadix*, 527 U.S. 343, 357–58 (1999), the plain text of old § 81 is addressed to "any person" and gives fair warning of the risk for "any person," such as Quantum, who fails to obtain Secretarial approval. *See A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 788 (9th Cir. 1986). Those who entered agreements with Indian tribes while old § 81 was in force without seeking Secretarial approval were on notice that such agreements could at a later date be deemed *void ab initio*. Most emphatically old § 81 warned that "[a]ll contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe . . . may be recovered by suit in the name of the United States . . . ." 25 U.S.C. § 81 (1994). *United States ex rel. Hall v. Tribal Development Corp.*, 49 F.3d 1208 (7th Cir. 1995), is illustrative of such *qui tam* litigation.

Concerns about unfairness that may arise from a retroactive determination that the 1996 Agreement was void *ab initio* are ameliorated by the possibility that Quantum may recover in *quantum meruit*, a question the Board did not resolve, *see Quantum*, 44 IBIA at 179. The Board concluded that the issue was not ripe and noted that none of the parties had addressed whether the Secretary's *quantum meruit* authority survived the

amendment of old § 81 in 2000. *Id*. at 207 & n.24. The Board observed, however, that if Quantum were to request the Regional Director to exercise the Secretary's *quantum meruit* authority under old § 81, then the Director would "have an opportunity to consider the exercise of such authority and to consider [Quantum's] views concerning the appropriateness of quantum meruit relief." *Id*.; *see also Quantum*, 52 IBIA at 290 n.2. The parties have not briefed this question and we venture no opinion on it.

## III.

Our retroactivity analysis assumed that old § 81 requires that the 1996 Agreement receive Secretarial approval. Quantum contends, however, that Secretarial approval was not required under old § 81 because the Agreement was neither "with a[] tribe of Indians" nor "relative to their lands." The Board's interpretation of ambiguity in old § 81 is entitled to deference under *Chevron*, 467 U.S. at 843. This interpretation is also consistent with the Indian law canon of construction, *cf. Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009), because it dovetails with the Indian-protective goals of old § 81. The Board's assessment of the connection between the "facts found and the choice made" is reviewed under the "very deferential" arbitrary and capricious review standard. *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

## A.

The Board concluded that the Pueblo was a party to the 1996 Agreement and thus that the Agreement was "with a 'tribe of Indians'" within the meaning of old § 81. *Quantum*, 44 IBIA at 198; *see Quantum*, 52 IBIA at 292. The preamble to the Agreement identifies the parties as Quantum "on the one hand" and the Pueblo and Kewa Gas "on the other hand." Section 9.9 of the Agreement provides that it "may not be modified or amended except in writing signed by *both* parties." (emphasis

added). The Board interpreted these provisions to mean that the Agreement was between two parties, treating "the Pueblo and Kewa as a single contracting unit." *Quantum*, 44 IBIA at 197. The Board also concluded that the Pueblo's 100% ownership of Kewa Gas's stock "denoting its complete and exclusive control over and interest in Kewa at the time the Agreement was signed" bolstered the conclusion that, "despite [the Pueblo's and Kewa Gas's] distinct roles and obligations . . . , the evidence on the face of the Agreement indicates that . . . [they] are treated collectively as a single 'party.'" *Id*.

Quantum views the distinct roles of the Pueblo and Kewa Gas as determinative, and it contends that the Board's failure to disaggregate them so the obligations that run between Quantum and Kewa Gas survive even if those between Quantum and the Pueblo are null and void is arbitrary and capricious. To emphasize the distinct legal personalities of the Pueblo and Kewa Gas, Quantum cites a New Mexico Supreme Court decision noting that corporate status is a legal identity separate and distinct from that of a corporation's shareholders. Appellant's Br. at 52 (citing *Scott v. AZL Res., Inc.*, 753 P.2d 897, 900 (N.M. 1988)). Quantum suggests that the Agreement's references to "both parties" and other similar language is equally consistent with the conclusion that Kewa Gas was the principal contracting party in a three-party agreement in which the Pueblo's inclusion was incidental, pointing to phrases such as "[Kewa Gas] hereby engages [Quantum] to manage, supervise, and operate [Kewa's] Gas Distribution Business" and to the separate signatures of the Pueblo and Kewa Gas on the Agreement as denoting their separate legal identities. *Id*. at 52–53. In Quantum's view, the Pueblo is simply a "nominal party" to the Agreement, having "undert[aken] almost no obligations of its own" insofar as the single promise it made, not to compete, "was an easy promise to keep, given that the Pueblo was Kewa [Gas]'s sole shareholder . . . ." *Id*. at 53–54. Viewing the Pueblo's inclusion

in the Agreement a "mere afterthought," *id*. at 52, Quantum maintains that the analysis in *Inecon Agricorporation v. Tribal Farms, Inc.*, 656 F.2d 498, 501 (9th Cir. 1981), should apply so that the portions of the Agreement that run between Quantum and Kewa Gas survive even if those between Quantum and the Pueblo do not.

The Board's conclusion that the Agreement was with the Pueblo is neither contrary to the plain meaning of old § 81 nor arbitrary and capricious. In context, the Agreement is reasonably interpreted as grouping the Pueblo and Kewa Gas together as a single party, given that the text of the Agreement is itself so structured. *See Quantum*, 44 IBIA at 196–97. Notably as well, the Agreement subjected the Pueblo to a non-compete covenant that imposed a real and specific duty on the Pueblo as a signatory. In *Inecon*, 656 F.2d at 501, the Ninth Circuit recognized the contractual obligations between a tribal corporation and a non-Indian third party despite the "contractual incapacity of the Tribe," which was also a signatory to the Agreement. But the contract in *Inecon* imposed only a vague duty of non-interference, giving the Tribe a "limited role." *id*. By contrast, the Pueblo's duty under the non-compete covenant in the 1996 Agreement was neither vague nor insubstantial. Quantum's assertion that the covenant requires no more of the Pueblo than that it protect its own interests by abstaining from involvement in other gas distribution businesses is speculative. The record hardly negates the possibility that, absent the covenant, the Pueblo could involve itself in the gas distribution business in New Mexico markets beyond those in which Kewa Gas operates; neither does it foreclose other possible collaborations that might be damaging to Quantum's economic interests while benefitting the Pueblo.
*Cf. Quantum*, 52 IBIA at 309.

**B.**

The Board, upon reviewing the legislative history of old § 81 and the case law interpreting it, concluded that the phrase "relative to [Indian] lands" was indefinite and broad but not ambiguous, bringing any agreement "relating to, necessarily connected with, or dependent upon the tribes' lands" within the scope of old § 81. *Quantum*, 52 IBIA at 308. Alternatively, assuming "relative to" was ambiguous, the Board concluded that the phrase should be given broad effect in light of "the historical context of paternalism" underlying old § 81's enactment and its legislative history, which did not suggest that the enacting Congress had any "intent to limit the relative-to-their-lands language only to agreements that conferred upon the non-Indian party the incidents of ownership of land." *Id*. at 309. The Board applied "the cardinal rule," *id.* at 307, that "until Congress repeals or amends a statute intended to protect Indians, we must give it a sweep as broad as its language and interpret it in light of the Congress that enacted it." *Id*. (quoting *Cent. Mach. Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 166 (1980) (internal quotation marks and alterations omitted)).

The Board offered two rationales for concluding that the 1996 Agreement was "relative to [Indian] lands." First, it found that the "value of the Agreement, and the consideration to Quantum for its services" was derived from the tax benefits conferred by the business's location on Pueblo land, and that because the non-compete clause "limited the right of the Pueblo and Kewa [Gas] to derive that same value on other Pueblo lands without Quantum's consent," the Agreement was relative to their lands. *Id.* at 310. Second, applying a slightly modified version of the four-factor analysis in *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 811 (7th Cir. 1993),[2] the Board

---

[2] In *Altheimer*, 983 F.2d at 811, the Seventh Circuit identified four criteria it found in the case law for interpreting the phrase

found: (1) the Agreement related to the management of a facility on the Pueblo's land; (2) Quantum exercised nearly exclusive control over the gas distribution business; (3) the non-compete clause restricted the Pueblo's use of its lands for purposes of competing in the gas distribution business in the State (somewhat like a negative easement); and (4) the tax benefit derived from the Pueblo's sovereign status was essential to the business's existence because absent the Tribe's legal sovereignty the tax benefit would not have accrued to it and returns for Quantum on the distribution business would have been significantly less. *Quantum*, 52 IBIA at 311–314 & n.19.

Quantum protests that the Board's loose application of the *Altheimer* factors, including its recognition of the adequacy of nearly exclusive, as opposed to exclusive, control under the modified test and its analogy between the non-compete provision and a negative easement, so twisted the Seventh Circuit's opinion as to make the Board's decision contrary to law. The Board is not bound to follow the Seventh Circuit's test and concluded that approach did not "encompass[] the outer limits of what the 41st Congress meant by the phrase 'relative to' Indian lands." *Id*. at 310. Its interpretation of the ambiguous phrase "relative to" is entitled to *Chevron* deference.

---

"relative to [Indian] lands" as it relates to contracts between a tribe of Indians and non-Indian third parties:

> (1) Does the contract relate to the management of a facility to be located on Indian lands? (2) If so, does the non-Indian party have the exclusive right to operate that facility? (3) Are the Indians forbidden from encumbering the property? (4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?

*Id*. The court cautioned that "none of the above factors are the '*sine qua non*' of a contract which relates to Indian lands." *Id*.

The Board's factual findings are virtually undisputed. To the extent that Quantum contests the significance of the non-compete provision and the relation between the Pueblo's tribal sovereignty and the tax benefits accorded to Kewa Gas, its arguments are unpersuasive. Furthermore, *Green v. Menominee Tribe of Indians in Wisconsin*, 233 U.S. 558, 569 (1914), lends support to the Board's interpretation, for in that case the Supreme Court held that a contract regarding the provision of logging equipment to an Indian tribe for use on their lands was sufficient to trigger the involvement of the Secretary under an earlier version of old § 81. Given the tenuous connection of that transaction to Indian lands and the fact that large fuel storage containers used in  the gasoline distribution business under the 1996 Agreement were physically on the Pueblo's lands, the Board's conclusion that old § 81 applied was at least within the outer limits of a permissible interpretation of the ambiguous phrase, "relative to [Indian] lands."

Accordingly, we affirm the grant of summary judgment.